Booth, Chief Justice,
delivered the opinion:
The Congress enacted the special jurisdictional act set forth in full in Finding I. The obvious purpose of the act is the adjudication of plaintiffs’ rights accruing legally or equitably in virtue of any treaties, agreements, laws of Congress, or misappropriation of funds. The controversy is by the record narrowed to three claims, viz, the alleged taking by the Government of lands embraced within the Indians’ reservation without their consent and without compensation; second, a claim for $50,000 for the value of timber alleged to have been cut and taken from their reservation by white trespassers; and, third, the cost of surveying the inner lines of their reservation in December, 1886, it being charged that the expense incident thereto was by express agreement chargeable to the United States and not the . Indians.
The first issue raises the important question as to when the reservation claimed in the petition was fixed and set aside by treaty stipulations between the Indians and the United States, and whether the treaty relied upon did in fact create the reservation claimed. The plaintiffs, composing a confederated tribe of Indians made up of three bands — the Arickarees, Gros Ventres, and Mandans — constituted a portion of the vast Indian population which in *330 habited the great western plains east of the Bocky Mountains and west and south of the Missouri Biver and its tributaries. Prior to 1851 the Indian tribes had repeatedly engaged in costly internecine warfare, and the plaintiff Indians had suffered from such strifes, not alone from a natural indisposition towards such hostilities but from apparent inability, because of lack of numbers, to cope with their more numerous and more savage neighbors. As a matter of fact, plaintiff Indians had been driven by repeated assaults upon them by the Teton Sioux, a warlike and seemingly irrepressible tribe which had consolidated its large numbers to the south and west of the Missouri Biver in territory not only adjacent to the plaintiffs’ ancient habitat but in proximity to the various other Indian tribes living within the Indian area involved in this case, to Fort Berthold, North Dakota. The one event which evoked immediate governmental action and negotiations with all the “ wild Indian tribes of the prairies ” was the discovery of gold in California. The abnormal increase in travel across the plains, following the discovery of gold in California, provoked the Indian tribes into the commission of violent depredations against the travellers, alleged to be due to the destruction of timber upon the Indian lands and the tribal fear of ultimate extinction of the buffalo and other game upon which they relied for food. In fact, the Indians resented the invasion of their domains. To pacify the Indians and to secure the right of free passage through the territory, as well as protect them in the future and reimburse them for losses sustained or to be sustained, the Congress on February 27, 1851 (9 Stat. 572), appropriated $100,000.00 to defray the expenses incident to “holding treaties with the wild tribes of the prairie and for bringing delegates on to the seat of government.” The President appointed the Superintendent of Indian Affairs, D. D. Mitchell, and Indian Agent Thomas Fitzpatrick as commissioners to conduct the negotiations. The commissioners were instructed as to their duties, and in addition to express instructions as to the procurement of free and unhampered passage through their territory, it was stated to them that “ It is important, if practicable, to establish for each tribe *331 s.ome fixed boundaries, within which they should stipulate generally to reside, and each should agree not to intrude within the limits assigned to another tribe without its consent.”
On September 1, 1851, the commissioners met eight Indian tribes at Fort Laramie, viz, the Sioux or Dah-co-tahs of the Missouri, Assinaboins, Gros Ventres, Arickarees, Crows, Shoshones or Snakes, Cheyennes and Arapahoes. Following sixteen days of negotiations a treaty was finally consummated with the tribes on September It, 1851, known as the Fort Laramie treaty. It was signed by the chiefs, headmen, and braves of all of the foregoing Indian tribes except the Shoshones, the commissioners believing that this tribe did not fall within their instructions, and in addition bore the signature of the Mandans. The treaty in haee verba appears in Finding V. The commissioners unquestionably followed their instructions; the stipulations of the treaty so attest. The important provision herein involved pertains to the description of the tract of land set forth in article 5, and the one issue vital to the plaintiff Indians’ right of recovery is whether this article did or did not create an Indian reservation.
We have adverted to some extent upon contemporaneous conditions. The Government was chiefly concerned with the procurement of a peaceable right of passage through the Indian country for its citizens, and the prevention of Indian warfare. Manifestly, those in charge of Indian affairs, as well as Congress, were looking towards the establishment of an agricultural policy for the Indians, a policy which must eventually curtail their nomadic habits, due, as was then seen, to the encroachments of the whites upon lands the Indians had long claimed, and from which they derived their living. We need do no more than merely assert that invasion of lands claimed by Indian tribes by either other Indian tribes or white men at once provoked hostilities. In what other way and for what other consideration could the commissioners have successfully accomplished their designed purpose than a governmental recognization of certain well-described lands as territory belonging to the Indians by right of occupancy ? It is true the treaty abounds in other *332 considerations for its execution, but the one involved here, i. e., distinct reservations, is not only specific in its terms, obligating the parties to irrevocable observance of the limits of lands set forth, but reserves in express words the claims of the Indians to other lands. The defendant says the territorial provisions were simply mutual recognition by the Indians of their claims to territory and its segregation by them, without positive governmental recognition or verification of the same. This contention, as we view it, concedes that when the commissioners approached the Indians their title by right of occupancy to all the territory embraced within the treaty was recognized by the commissioners representing the Government, and that what the treaty did was to segregate the same into individual tribal allotments. In other words, the Government not only recognized the Indian title, never at any time disputing it, but by solemn treaty, following negotiations, expressly agreed that each tribe was to be assured title to the territory set aside for it. Surely it was not essential to procure by treaty the grant of a perpetual right of way through Indian lands if' the Indians did not own the same by right of occupancy. It is true the lands set aside to each tribe embraced a vast domain. To the plaintiff Indians the treaty segregated a territory of about 21,000 square miles and embracing close to 13,000,000 acres of land. With this vast estate, however, the treaty deals, and whether the Government in ratifying the treaty was moved by the then nominal value of somewhat of a wilderness, or concerned in Indian peace at present costs, the fact is the treaty was ratified in the manner provided by law and no unusual circumstance attended its negotiation, and no challenge is now made to its validity, despite the existence of an unusual situation as to its proclamation.
Commissioner Mitchell in reporting upon the treaty used this language:
“ The laying off of the country .into geographical or rather national domains I regard as a very important measure, inasmuch as it will take away a great cause of quarrel among themselves, and at the same time enable the Government to ascertain who are the depredators, should depredations hereafter be committed. The accompanying map, upon which *333 these national boundaries are clearly marked and defined, was made in the presence of the Indians, and fully approved and sanctioned by all.”
The language of the treaty, while not in all respects the technical wording used in other Indian treaties is, we think, sufficient when considered in connection with the .instrument as a whole and the purpose and intent of the parties thereto, to clearly indicate that the the territory of the Indians was to be delimited in accord with their claims and protection assured them within its bounds, in consideration of the rights and privileges secured to the United States and its citizens.
The long-existing cause of Indian wars which had excluded the whites from this section of the country arose in large part over intertribal disputations as to tribal territory, and it is difficult to perceive in what way and under what circumstances it may be held that the provisions of the treaty did not assure to the plaintiff Indians a governmental concession that the territory mentioned in the treaty was to be held by them as Indian country was held by Indians. Beyond doubt, the Indians so understood the treaty, and the Congress legislated in accord with its amended terms, to which the Indians agreed. The law, for which we need not cite familiar precedents, is that in controversies between the Indians and the Government arising out of doubtful and ambiguous provisions of treaties or contracts they are to be taken most strongly against the Government. The Indians’ rights are not to be prejudiced by technical construction or words of doubtful import. The Government’s policy of recognizing Indian title to lands over which the tribes ranged in hunting for game necessarily involved large areas, .and the early Indian treaties exemplify this fact. Lands were not then cultivated to any extent and acreage value was exceedingly nominal, so that it is impossible for the court to construe treaty stipulations as intending a mutual arrangement between the Indian parties, rather than the delimiting of claimed Indian reservations upon the single fact of large areas and extensive habitats. We are considering a transaction completed almost *334 eighty years ago, a period of time when the wild Indians of the prairies were occupying and in possession of the lands involved in the treaty of Fort Laramie, and the problem to be solved related exclusively to the adoption of policies and measures calculated to insure the safety of the white emigrant in Indian country and tribal peace between the tribes themselves. The quantity of land involved was not a serious factor; the perplexing question was the division of the domain among the tribes in such a way as to assure tribal peace. This, we think, the treaty accomplished to a large extent, and from that day to this the tribes have continuously insisted upon their title to the lands described in the treaty.
The Supreme Court has repeatedly held that the Indians’ claim of right of occupancy of lands is dependent upon actual and not constructive possession. Mitchel v. United States, 9 Pet. 711; Williams v. Chicago, 242 U. S. 434; Choctaw Nation v. United States, 34 C. Cls. 17. Beyond doubt, abandonment of claimed Indian territory by the Indians will extinguish Indian title. In this case the Government interposes the defense of abandonment, asserting that the facts sustain the contention. It is of course conceded that the issue of abandomnent is one of intention to relinquish, surrender, and unreservedly give up all claims to title to the lands described in the treaty, and the source from which to arrive at such an intention is the facts and circumstances of the transaction involved. Forcible ejection from the premises, or nonuser under certain circumstances, as well as lapse of time, are not standing alone sufficient to warrant an abandonment. Welsh v. Taylor, 18 L. R. A. 535; Gassert v. Noyes, 44 Pacific 959; Mitchell v. Corder, 21 W. Va. 277.
The Government cites the history of the plaintiff Indians and their successive migrations until their final habitat at Fort Berthold. Much reliance is placed upon their comparatively small population and the fact that Sioux wars repeatedly forced them into small villages from which they dared not venture for fear of extinction by that savage tribe. It is argued that the very vastness of the area involved, in comparison with the Indian population, precluded *335 the possibility of occupancy of the same. It is impossible from the record to fix with accuracy the population of the plaintiff Indian tribes during the period of this controversy; that they were not an unusually large tribe seems evident. Unquestionably their numbers were reduced at times by disease and warfare. However, it is established that a sufficient population continuously prevailed to establish their autonomy and maintain their tribal existence. In 1804, according to the Government’s citation, their population was sufficiently large to occupy the lands, and we find no evidence in the record of sufficient probative value to sustain us in deciding that their number so materially decreased as to render it impossible to range over the territory claimed. In 1869 their population was near to 2,800. It is admitted without any resei'vations that the plaintiff Indians not only observed the treaty stipulations as they appear in the treaty of 1851, but were by nature and disposition a peaceable, quiet tribe engaging in agricultural pursuits in the summer season and hunting game in the winter. That they ranged over the entire country involved is established by numerous reports, and that they claimed it as their own is firmly proven. The neighboring Sioux were the plaintiffs’ inveterate enemies. This hostile tribe forced the plaintiff Indians to relocate their villages more than once along the Missouri Kiver, and unquestionably the continuing menace of Sioux hostilities precluded at times extensive hunting excursions into the claimed territory; but assuredly armed intervention, forcible ejection from lands, and fear of death and tribal destruction do not indicate abandonment. For some few years following the treaty of 1851 the Sioux observed its stipulations, and the record seems to establish that the later outbreaks of the Sioux were not occasioned so much over territorial disputes as over the alleged invasion and depredations of white emigrants in or passing through the territory.
In July, 1866, a treaty was negotiated with the plaintiffs. This treaty ceded certain described lands to the plaintiffs. The plaintiffs signed it, but it failed of ratification by Congress. In August, 1868, by Executive order the Govern *336 ment established Fort Buford [Reservation, a reservation comprising 98,645.67 acres of land, all within the boundaries of the lands described in the treaty of 1851.
In July, 1869, in response to complaints from the plaintiffs of serious depredations upon their timberlands, the major general in command of the Military Department of' Dakota reported to his superior officer that he had visited the plaintiff Indians and had a council with them. One question which disturbed the council was whether the plaintiffs legally possessed a reservation or whether one had ever-been allotted to them. The major general instructed the commanding officer at Fort Stevenson to survey the country and recommend the setting aside of a reservation for the Indians. This was done and a report thereof forwarded to Washington. The Commissioner of Indian Affairs in August, 1869, advised the commanding officer of the existence of the treaty of 1851 providing a reservation, and of the unratified treaty of 1866, concluding with the statement that “ there are no treaty stipulations with these Indians relative to a reservation for them which have been ratified.” Acting upon this erroneous information — a fact which the Government now concedes — a delimited reservation described in Finding X was by the Executive order of April 12, 1870, set aside to the plaintiff Indians. The lands embraced within the 1870 reservation were part of the precise lands, with an unimportant exception, described in the treaty of 1851. The establishment of this reservation reduced the territory described in the treaty of 1851 to the extent of 4,686,612.43 acres of land, and the Indians occupied the reduced reservation. The treaty of Fort Laramie of 1851 was ratified by the Senate on May 24, 1852, after amending article 7 of the same. The amended treaty was returned to the tribes for their assent to the modification of the same. All tribes assented thereto, and due to an administrative error and oversight the treaty was never proclaimed; hence, the Indian Office and other delegated officials concerned in negotiations with the Indians proceeded upon the erroneous conviction that the Fort Laramie treaty was never ratified. Congress, however, recognized its terms and appropriated the sums mentioned in the treaty to meet the Government’s *337 annual obligations under it to the Indians. There can be no doubt that the failure of governmental officials and others dealing with the Indians at this time to recognize the treaty of 1851 was due exclusively to a belief that the treaty of 1851 was never ratified by the Senate. The plaintiff Indians were at the time an ignorant and unlettered people, forced by their status and situation to rely implicitly upon the representatives of the Government, and while they laid claim to a much larger territory than the 1870 reservation, they were in no position to controvert an alleged existing condition, which was represented to them by those in authority as leaving them without any landed reservation whatever. As we look at it, it was the Government’s error and unintended misrepresentation which resulted in procuring a settlement with the Indians in 1870 which did not equitably compensate them for rights granted under the Fort Laramie treaty of 1851. The various special jurisdictional acts conferring jurisdiction upon this court to adjudicate Indian controversies, the decisions of the Supreme Court and this court, the policy of the Government from time immemorial, attest the indisputable rule that tribal Indians were not to be divested of ceded reservations, ceded under treaties and acts of Congress, without compensating them for the lands taken from them in diminishing their holdings. We think it nonessential to encumber this opinion with the innumerable cases demonstrating the rule. If we are correct in our analysis of the record, the plaintiffs are entitled to recover, under the treaty of 1851, the difference in value between the reservation allotted under that treaty and the reservation established by the Executive order of 1870.
The construction of the Northern Pacific Railroad, with the aid of grants of land through which the line passed, again diminished the plaintiff’s reservation. This railroad ran through the Indians’ reservation as fixed by the Fort Laramie treaty of 1851. Section 2 of the land grant provided for the extinguishment of Indian titles. On June 23, 1878, the officials of the railroad notified the Commissioner of Indian Affairs that the line of the road ran through the *338 lands ceded to the Indians as a reservation in 1870, and inasmuch as the grant to the railroad covered every alternate section of land along its right of way, it was essential in order to expedite building that the Indians’ reservation be altered and Indian title extinguished so that progress might attain, and railroad lands be freed from Indian claims of title. In July, 1879, the Commissioner of Indian Affairs recommended the withdrawal from the reservation of a large acreage of lands, ceding the Indians lieu lands on the north bank of the Missouri River. On July 13, 1880, by Executive order the recommendations of the commissioner were made effective. (Finding XIV.) As a result of the foregoing order, in connection with additional landed transactions described in Findings XV and XVI, the plaintiffs’ reservation as set out in the Fort Laramie treaty was again diminished to the extent of 6,639,254.66 acres, leaving the remaining area of the territory described in the treaty of 1851, with the additions made thereto in 1870 and 1880 as the plaintiffs’ reservation, the major portion of which was duly ceded by them subsequent to the treaty of 1886. Thus it is shown that through governmental action the plaintiffs’ reservation as described in the treaty of 1851 was diminished by successive takings to the following extent, viz, 11,424,-512.76 acres, itemized as follows: 98,645.67 set aside for Fort Buford Military Reservation, 4,686,612.43 acres taken under the Executive order of 1870, and 6,639,254.66 taken under the Executive order of 1880. However, the Executive orders of 1870,1880, and 1892 added to the plaintiffs’ landed estate 1,578,325.83 acres, no portion of which was included in the lands described in the treaty of 1851 and the major portion of which was thereafter ceded to the Government and for which the plaintiffs received payment, thereby reducing the number of acres finally taken by the Government, for which no compensation has been paid, to 9,846,186.93 acres. (Finding XXI.)
It is an essential function of the court to reconcile the record as to the amount of compensation to which the Indians are entitled, predicated upon the value of the lands. *339 The plaintiffs seek to fix an acreage market value of $1.25 per acre, the price for which much of the territory was offered by the Government to settlers. The contention we believe is untenable. The acreage price offered to settlers was adjusted on a basis of limited allotments, the entire consideration to be paid in stated installments. The judgment we are to render is to be based on takings embracing large areas of land, totaling in two instances millions of acres and in the other close to a hundred thousand acres. When these large tracts were acquired it is apparent that enormous expense is involved in the future segregation of the tracts into marketable units and their sale upon installment payments. The Government’s overhead in the maintenance of a department to accomplish their disposition and the incidental expense accompanying the transaction indisputably establishes that the $1.25 per acre was not all profit, if, in fact, profit accrued at all. The Indians could not have disposed of the lands in the way and manner the Government did, and while the homestead laws valued the lands at $1.25 per acre, the return to the Government was not a net but a gross price. We give the Indians a judgment in this case for the value of the lands free from all the expense of sale or segregation for sale. To claim a uniform price of $1.25 per acre, free from the character of expense enumerated, would, in our judgment, award the plaintiffs a sum much beyond any price they could have obtained had they offered the tracts for sale.
The plaintiffs are entitled to just compensation to be fixed upon the basis of the amount they might have obtained for the large areas taken at the time they were taken. It is conceded in the briefs of both parties that in 1851 the Indian country involved possessed little, if any, market value. It is, of course, obvious that the Indians could not have sold it or transferred a title in fee. The discovery of gold in California did not appreciably affect the value of the domain. It was not until 1870 that activities concentrated upon the domain and civilization began to push itself into that section of the country. The Civil War had intervened *340 in this period and during the war several Indian hostilities prevailed. The building of the railroad was among, if not, the first event which tended to give a market value of any consequence to the land, and it is inconceivable that 4,686,-612.43 acres of land of varying quality and location could possibly have been disposed of in excess of fifty cents per acre. This, we think, represents the maximum of value, a sum deduced from a conflicting record and in harmony with the price fixed by the Government for lands acquired about the same period of time from other Indian tribes in the same locality in cessions to the Government of their reservations in many treaties. The record discloses but a single instance wherein the various tribes of Indians occupying adjacent territory ever asserted a claim for as much as $1.25 per acre for lands in this section ceded to the Government by treaty stipulations, and in addition to this fact the plaintiffs in December, 1886, sold to the Government 1,782,831.64 acres of their then reservation for a little less than 45 cents per acre. Almost 779,000 acres of the total amount sold in 1886 were within the boundaries of the lands described in the treaty of 1851. The record convinces us that the Indians themselves did not and would not have valued their lands at the time they were taken at a greater average value than fifty cents per acre. This acreage value is not, of course, the highest claimed, nor does it represent the price, much lower, contended for by the Government. It is the acreage value which we believe the lands might have brought if offered for sale, considering the title of the Indians and the circumstances surrounding a transfer of the magnitude and importance involved. On this basis we award total value of $4,923,093.47.
The jurisdictional act charges the Indians with “ all sums heretofore paid or expended for the benefit of said tribe or any band thereof.” The Government under the foregoing provision of the jurisdictional act charges the Indians with $290,827.25, alleged to be pro rata cost of educating individual children of the bands at various nonagency Indian schools. The amount charged is arrived at by ascertaining *341 the per capita cost of maintaining the schools and charging the same to the Indian tribe as the number of children attending appears. The Government during the period maintained at its expense Indian schools at Carlisle, Pa., Chilocco, Okla., Lawrence, Kan., Pipestone, Minn., and Pierre, S. D. Congress appropriated from the Treasury in accord with a governmental policy to extend the privileges of education to Indian children for the express intent of eventually changing the hereditary habits and customs of the tribes. The motive involved was more directly beneficial, from a governmental standpoint, to the Government than to the tribe. Of course, educational facilities were of prime necessity and imperative, and eventually resulted in benefit to the tribe, but the immediate beneficial results were individual and not tribal.
We do not believe that the jurisdictional act comprehends a set-off against the claim of the Indians for this item of expenditure in behalf of children of Indian tribes indiscriminately. To so hold might result in sustaining an obvious injustice, for the bands involved in this litigation would be held to contributing a sum toward the maintenance of the schools, while other tribes with much larger attendance would escape payment for benefits of equal value. The sums chargeable, we think, must be restricted to the usually recognized and customary distributions made to the Indians as tribes and bands, unless a contrary purpose is expressed in the act. Public institutions established for the Indian race were maintained from public funds as an adopted public policy, in the nature of gratuity. The Government, we think, did not expend and is not entitled to a counterclaim of more than $2,753,924.89, leaving a judgment in favor of the Indians in the amount of $2,169,168.58. Judgment for this amount is awarded the plaintiffs. It is so ordered.
Williams, Judge; Littleton, Judge; and GREEN, Judge, concur.
Whaley, Judge, did not hear this case and took not part in its decision.