**CROW TRIBE OF INDIANS**

v.

**UNITED STATES.**

No. 1–59.

United States Court of Claims.

Nov. 2, 1960.

Whitaker, J., and Jones, Chief Judge, dissented.

Carl S. Hawkins, Washington, D. C., for The Crow Tribe of Indians. Ralph G. Wiggenhorn, Wiggenhorn, Hutton, Schiltz & Sheehy, John M. Schiltz, Billings, Mont., Wilkinson, Cragun & Barker, John W. Cragun, and Charles A. Hobbs, Washington, D. C., on the briefs.

Maurice H. Cooperman, Washington, D. C., with whom was Asst. Atty. Gen. Perry W. Morton, for the United States.

MADDEN, Judge.

These are cross-appeals from a decision of the Indian Claims Commission. The Commission decided that under the Indian Claims Commission Act of 1946, 60 Stat. 1049, 25 U.S.C.A. § 70 et seq., the Crow Tribe of Indians was entitled to recover additional compensation for 30,-530,764.8 acres of land, situated in what is now south central Montana and north central Wyoming, which the Tribe ceded to the United States by the Treaty of May 7, 1868, 15 Stat. 649. In its petition to the Commission the Tribe alleged that prior to the date of that treaty, it owned 38,531,174 acres, and that by the Treaty of 1868 it ceded all of its lands, except for a reservation containing 8,000,409.2 acres, to the United States for an inadequate and unconscionable consideration.

The Commission considered the case in two stages. First, the Commission held that the United States had, by the Treaty of Fort Laramie, signed on September 17, 1851, 11 Stat. 749, recognized the Indians' title to the lands in question. 3 Ind.Cls.Comm. 147. The Commission then considered the question of the value of the lands and of the consideration received, and concluded that the lands had a market value in May of 1868 of an average of $0.40 per acre, but that the Tribe

had received less than $0.054 per acre. 6 Ind.Cls.Comm. 98. The Commission held that this consideration was unconscionable.

The Government appeals from the holding that the Tribe's title to the land had been recognized, and from the Commission's overruling of its defenses of *res judicata* and lack of jurisdiction. The Crow Tribe appeals from the Commission's valuation of the lands, contending that it was too low.

In order to recover for the value of the lands it ceded to the United States in 1868, the Tribe was required to show that it possessed a compensable interest in those lands at that time. This could have been shown in either one of two ways. First, the Tribe could have shown that it had "Indian title" to the lands in question; that is, that it used and occupied those lands from time immemorial, to the exclusion of all others.[1] On the other hand, it could show that at some time prior to 1868 the United States had recognized or acknowledged that the Tribe had title to the lands. The Tribe took the position, and the Indian Claims Commission agreed, that by the Treaty of Fort Laramie, signed in 1851, the United States had recognized the Tribe's title to the lands. The significance of the question of whether the Tribe's title had been recognized lies in the fact that if the Tribe did have such recognized title, it was not required to prove actual use and occupancy of the lands.

The Government says that the Treaty of Fort Laramie was not a treaty of recognition. Although we think that it is abundantly clear that prior decisions of this court,[2] which we will discuss below, have held that the treaty did recognize the Tribe's title to the lands described therein, we think it appropriate to make some observations upon the treaty and the preparation and negotiations which led up to it, since the Government has in this case seen fit to urge so vigorously a position which has already been rejected by this court.

The occasion for and circumstances of the making of the Treaty of Fort Laramie are recited in the decision of this court in the Fort Berthold case, supra, 71 Ct.Cl. at pages 329–331 and will be further discussed in this opinion.

The treaty itself, 11 Stat. 749, IV Kapp. 1065, contains, among others, the following provisions:

"Article 1. The aforesaid nations, parties to this treaty, having assembled for the purpose of establishing and confirming peaceful relations amongst themselves, do hereby covenant and agree to abstain in future from all hostilities whatever against each other, to maintain good faith and friendship in all their mutual intercourse, and to make an effective and lasting peace.

"Art. 2. The aforesaid nations do hereby recognize the right of the United States Government to establish roads, military and other posts, within their respective territories.

"Art. 3. In consideration of the rights and priviliges acknowledged

---

1. It should be noted that under the Indian Claims Commission Act of 1946, 60 Stat. 1049, 25 U.S.C.A. § 70, et seq., an Indian Tribe has the right to recover for both "recognized title" and unrecognized "Indian title." Otoe and Missouria Tribe of Indians v. United States, 131 F.Supp. 265, 131 Ct.Cl. 593, 599–624, certiorari denied 350 U.S. 848, 76 S.Ct. 82, 100 L.Ed. 755. It is true that prior to the passage of that Act, a tribe's right to recover for the taking of unrecognized Indian title depended upon specific statutory authorization, and that in the absence of such authorization no recovery could be had. Tee-Hit-Ton Indians v.

United States, 348 U.S. 272, 285, 75 S. Ct. 313, 99 L.Ed. 314. But the Indian Claims Commission Act has now provided the required statutory authorization of recovery for unrecognized Indian title, so the question of recognition bears only upon the issue of how title is to be proved.

2. Fort Berthold Indians v. United States, 71 Ct.Cl. 308; Assiniboine Indian Tribe v. United States, 77 Ct.Cl. 347, certiorari denied 292 U.S. 606, 54 S.Ct. 772, 78 L.Ed. 1467; The Crow Nation v. United States, 81 Ct.Cl. 238.

in the preceding article, the United States bind themselves to protect the aforesaid Indian nations against the commission of all depredations by the people of the said United States, after the ratification of this treaty.

"Art. 4. The aforesaid Indian nations do hereby agree and bind themselves to make restitution or satisfaction for any wrongs committed, after the ratification of this treaty, by any band or individual of their people, on the people of the United States, whilst lawfully residing in or passing through their respective territories.

"Art. 5. The aforesaid Indian nations do hereby recognize and acknowledge the following tracts of country, included within the metes and boundaries hereinafter designated, as their respectice territories, viz:

&ast; &ast; &ast; &ast; &ast; &ast;

"The territory of the Crow Nation, commencing at the mouth of Powder River on the Yellowstone; thence up Powder River to its source; thence along the main range of the Black Hills and Wind River Mountains to the headwaters of the Yellowstone River; thence down the Yellowstone River to the mouth of Twenty-five Yard Creek; thence to the headwaters of the Muscleshell River; thence down the Muscleshell River to its mouth; thence to the headwaters of Big Dry Creek, and thence to its mouth.

&ast; &ast; &ast; &ast; &ast; &ast;

"It is, however, understood that in making this recognition and acknowledgment the aforesaid Indian nations do not hereby abandon or prejudice any rights or claims they may have to other lands; and further, that they do not surrender the privilege of hunting, fishing, or passing over any of the tracts of country heretofore described."

The Government's argument seems to be that because Article 5 of the Treaty speaks of recognition and acknowledgment by the Indian nations rather than by the United States, the Treaty was merely one of peace and friendship among the several tribes and between them and the United States.

■■ This construction has been fully considered and rejected by this court in the past, and we reject it again. It is true that the language of the Treaty is not the technical language of recognition of title. Nevertheless, we think that the participation of the United States in a treaty wherein the various Indian tribes describe and recognize each others' territories is, under the circumstances surrounding this treaty, and in light of one of the overriding purposes to be served by the treaty, i. e., securing free passage for emigrants across the Indians' lands by making particular tribes responsible for the maintenance of order in their particular areas, a recognition by the United States of the Indians' title to the areas for which they are to be held responsible, and which are described as "their respective territories." Indeed, the provision of Article 4 of the Treaty that the various tribes were to make satisfaction for "any wrongs committed &ast; &ast; &ast; on the people of the United States, whilst lawfully residing in or passing through their respective territories" implies the recognition by the United States in the tribes of a principal attribute of sovereignty, that is, the power of internal police. An examination of the documents pertaining to the preparations for and negotiation of the Treaty supports this conclusion.

When the Treaty of Fort Laramie was signed in 1851, gold had recently been discovered in California. Increasing numbers of people journeying westward were crossing the lands of the Indians. Buffalo and other game fell prey to the travelers' need for food (and sometimes to their need for sport). See Executive Document No. 1, House of Representatives, 30th Cong., 2d Sess., p. 442. Timber and forage were consumed in increasing quantities. The Indians resented these inroads, and their resistance often made the westward journey a perilous one.

The United States recognized that the serious losses of supplies which were vital to their subsistence gave the Indians cause for dissatisfaction, and the Government was anxious to make the way safe for the travelers. Mr. W. Medill, the United States Commissioner of Indian Affairs, in a letter dated June 15, 1849, suggested to the Secretary of the Interior that some inducement be offered the Indians to influence them to cease their attacks upon the emigrants. He stated:

" * * * They [the Indians] look upon the intrusion of the large bodies of emigrants into *their country*, and particularly the consequent great destruction of buffalo, which is their almost sole reliance for subsistence, with great jealousy and discontent; * * *

" * * * [A]s, until recently, *they have, unmolested, held undisputed possession of the country, which they regard as their own*, it is not to be expected that the passage of such large bodies of emigrants thro' it, and their ravages upon the buffalo, can take place without exciting in them dissatisfaction if not animosity; or that they will remain at peace and abstain from attacks and depredations upon the emigrants, unless some strong inducements are held out to influence them to do so. Under these circumstances, whatever may be the nature and extent of their title to the lands, I think it would be sound policy to make them some annual compensation for the right of way through the country, and in consideration of the destruction of the buffalo therein—by which they must at no late day, be seriously inconvenienced and injured—as well as to conciliate their friendly feelings towards our emigrants. * * *

" * * * I would therefore strongly recommend that measures be adopted, at as early a period as practicable, for entering into a treaty of friendship and amity, binding them to remain peaceable, and not only to avoid all aggressions upon our citizens, but to aid and assist them, so far as may be in their power, in passing through *their country* in safety, and stipulating for a suitable annual remuneration to them, upon the condition mentioned. * * * " [Emphasis added.]

On August 16, 1849, Mr. Orlando Brown, the new Commissioner of Indian Affairs, wrote to Thomas Fitzpatrick, a Superintendent of Indian Affairs, informing him that the recommendations made in the June 15 letter had been approved by the Secretary of the Interior, who directed that they be carried into effect. Commissioner Brown instructed that

" * * * The arrangements desired can best be effected by a treaty, to which all the Indians, or the larger and more important tribes of your agency, shall be parties; and which shall bind them to abstain from hostilities against each other, and not only from molesting in any way our military expeditions or emigrants, but to afford them any kindness or facilities in their power, when needed. *There should also be a clear and definite understanding as to the general boundaries of the sections of country respectively claimed by them, as their residence and hunting grounds; and they should be required not to trespass upon those of each other without permission from the occupant tribes*, or from the proper agent or agents of the government. * * * " [Emphasis added.]

In his annual report to the Commissioner of Indian Affairs written from St. Louis on October 13, 1849, Superintendent of Indian Affairs D. D. Mitchell stated:

" * * * Again, the boundaries dividing the different tribes have never been settled or defined; that is the fruitful source of many of their bloody strifes, and can only be removed by mutual concessions,

sanctioned by the government of the United States. *The boundaries being once established and clearly understood, each tribe could be held responsible for any depredations that might be committed within their respective territories. * * * "* [Emphasis added.]

The Commissioner, in turn, in his annual report to the Secretary of the Interior, dated November 30, 1849, stated:

" * * * Under these circumstances, it has been deemed expedient and advisable to take measures to bring about a proper understanding with the Indians, which will secure their good will, and prevent collisions and strife among them, *by obligating each tribe to remain as much as possible within their respective districts of country,* and providing that, where disputes or difficulties occur, they shall be submitted to the government, and the Indians abide by its decision. * * * " [Emphasis added.]

Congress by the Act of February 27, 1851, 9 Stat. 570, 572, appropriated $100,000 for the expenses of making treaties with the Indian tribes of the prairies. The President designated D. D. Mitchell and Thomas Fitzpatrick to act as treaty commissioners. In his letter to Mitchell, under date of May 26, 1851, informing him of his selection as a treaty commissioner, the Commissioner of Indian Affairs re-emphasized the need to provide compensation to the Indians for the use of the right of way across their lands, and stated:

"It is important, if practicable, to establish for each tribe some fixed boundaries, within which they should stipulate generally to reside, and each should agree not to intrude within the limits assigned to another tribe without its consent. If in arranging such boundaries there should be a portion of country not included where it has been their habit to go periodically in pursuit of game, it should be recognized as a neutral ground where all will enjoy equal privileges and have no right to molest or interfere with one another. IV Kappler, Indian Affairs, Laws and Treaties, Senate Document 53, 70th Cong., 1st Sess., p. 1074–1075."

Negotiations between the treaty commissioners of the United States and representatives of the various Indian tribes began on the Treaty Ground near Fort Laramie in the Indian Territory on September 8, 1851. According to an account of the proceedings which was published in a St. Louis newspaper, The Republican, during his address to the Indians on the first day of negotiations Mitchell said, in substance, the following:

"The ears of your Great Father are always open to the complaints of his Red Children. He has heard and is aware that your buffalo and game are driven off, and your grass and timber consumed by the opening of roads and the passing of emigrants *through your countries.* For these losses he desires to compensate you. He does not desire that his White Children shall drive off the Buffalo and destroy *your hunting-grounds,* without making you just restitution. But at the same time that he is willing to make you just compensation for injuries you may receive, he expects and will exert the right of free passage for his White Children over the roads running *through your countries,* and restitution for any injuries they may receive from you or your people, whilst passing *through your respective countries.* For the purpose of maintaining peace between the two nations, and for the protection of all parties, he desires from you a recognition of his right to establish military posts, and such other posts as he may deem necessary.

"In order that justice may be done each nation, it is proposed that *your country* be divided into geographical districts—that the country and its boundaries shall be designated by such rivers, mountains and lines, as will *show what country each nation*

*claims and where they are located.* In doing this it is not intended to take any of *your lands* away from you, or to destroy your rights to hunt, or fish, or pass over the country, as heretofore. But it will be expected that each nation will be held responsible for depredations committed *within its territory,* unless it can be clearly shown that the people of some other nation committed them, and then that nation will be held responsible. \* \* \*

\* \* \* \* \* \*

"When you have made peace between all your nations here assembled, there will be no occasion for war parties going into *the country of another nation.*" [Emphasis added.] St. Louis Republican, October 26, 1851

The November 9, 1851, edition of the Republican reports that the entire day of September 12 was

"given up to an attempt to designate on the map the territory of each of the nations, and *to mark it by metes and bounds.* \* \* \*

\* \* \* \* \* \*

" \* \* \* After much consultation, particularly of the Indians among themselves, the metes and bounds of the several nations were agreed upon."

The import of these numerous statements by United States Government officials is too clear to be mistaken. The purpose of the Treaty of Fort Laramie was to establish, as between the United States and the various signatory tribes,

the boundaries of the lands of the tribes. These boundaries were recognized as much by the United States, for purposes of determining the Indians' rights thereto, as they were by the Indians, for purposes of accepting responsibilities therefor.

The fact that on September 12, 1851, Mitchell pointed out that they were not prohibited from hunting upon or "going into the territory of any other Nation, so long as they remained at peace," (St. Louis Republican, November 9, 1851) does not imply otherwise. The prerogatives of recognized title are not such as to preclude all right of entry by others upon the territory in question. Indeed, one of the purposes of recognizing title is to regularize the rights of other parties within the territory.

Finally, we note that in his report, dated November 11, 1851, transmitting the Treaty to the Commissioner of Indian Affairs, Mitchell stated:

" \* \* \* The laying off of the country into geographical or rather national domains, I regard as a very important measure, inasmuch as it will take away a great cause of quarrel among themselves, and at the same time enable the government to ascertain *who are* the depradators, should depradations hereafter be committed." [Emphasis in original]

This was another illustration of the fact that the United States Government had an important role in the recognition of the domains of the various tribes by the Treaty of Fort Laramie.[3]

---

3. It is of interest to note that in the brief which the United States filed in this court in the case of The Crow Nation v. United States, No. H–248, 81 Ct.Cl. 238, which brief appears at page 873 of volume 671 of the Printed Records of the Court of Claims, the United States took the position that the Government had made clear to the Crows that the Treaty of Fort Laramie had recognized the Crows' title. The Government pointed to several references which had been made by Commissioner of Indian Affairs Taylor, during the council with the Crow Indians in November 1867 at which the

Treaty of May 7, 1868 was negotiated, to the country in which the Crows lived as "your country" or "your land", and the Government argued that under the circumstances the statement of Commissioner Taylor " \* \* \* could have had no other meaning—and most assuredly had no other meaning in the minds of the Indians—than that the Government recognized their ownership in their lands. They were then told that the Government desired to buy of them the right to use and settle the remainder of the Crow land after a part suitable to the Crows had been marked off for their

The Indian Claims Commission, in its able and exhaustive opinion on this aspect of the case, after consideration of all the evidence, made findings of fact and reached conclusions of law with which we are in complete agreement except in one particular which is discussed under the last heading of this opinion. In addition to being in accord with what we think is a correct interpretation of the Treaty of Fort Laramie, the conclusions of the Indian Claims Commission are in accord with the prior decisions of this court.

In Fort Berthold Indians v. United States, 71 Ct.Cl. 308, decided in 1930, this court, in a careful and able opinion by Chief Justice Booth, held that the Treaty of Fort Laramie was a recognition by the United States of the Indians' title to the lands described in the treaty.

The court said, at p. 332, in answering the very argument upon which the defendant so heavily relies in this case:

"The defendant says the territorial provisions were simply mutual recognition by the Indians of their claims to territory and its segregation by them, without positive governmental recognition or verification of the same. This contention, as we view it, concedes that when the commissioners approached the Indians their title by right of occupancy to all the territory embraced within the treaty was recognized by the commissioners representing the Government, and that what the treaty did was to segregate the same into individual tribal allotments. In other words, the Government not only recognized the Indian title, never at any time disputing it, but by solemn treaty, following negotiations, expressly agreed that each tribe was to be assured title to the territory set aside for it. Surely it was not essen-

tial to procure by treaty the grant of a perpetual right of way through Indian lands if the Indians did not own the same by right of occupancy."

The court concluded, at p. 333:

"The language of the treaty, while not in all respects the technical wording used in other Indian treaties is, we think, sufficient when considered in connection with the instrument as a whole and the purpose and intent of the parties thereto, to clearly indicate that the territory of the Indians was to be delimited in accord with their claims and protection assured them within its bounds, in consideration of the rights and privileges secured to the United States and its citizens."

In Assiniboine Indian Tribe v. United States, 77 Ct.Cl. 347, certiorari denied, 292 U.S. 606, 54 S.Ct. 772, 78 L.Ed. 1467, the court, after concluding that the Assinboines had failed to prove that they had title by immemorial possession to certain lands north of the Missouri River which they claimed, said, at pages 370–371:

"The plaintiff's case with reference to what is called the Fort Laramie lands is quite different. *The lands were expressly granted to the plaintiff tribe by the treaty made with the plaintiff on September 17, 1851 [The Fort Laramie treaty],* and one of its purposes was to give each tribe some fixed boundaries within which they should stipulate generally to reside. It was also desired to give the Indians, some compensation for the interference with the Indian hunting expeditions caused by emigrants passing to the Pacific coast region." [Emphasis supplied.]

home. There is nothing in the record which shows or even suggests that from this time until the signing of the treaty on May 7, 1868, any statement was carried to the Crows which could have shaken their belief that they owned the country delimited by the 1851 treaty, and

that they could sell it or not as they pleased, and, if they did sell it, that they could demand a valuable consideration and refuse to accept less than they, as vendors, were willing to accept." 671 Printed Records of the Court of Claims at pages 1009–1010.

In The Crow Nation v. United States, 81 Ct.Cl. 238, 271–272, decided in 1935, this court again reaffirmed its view of the Treaty of Fort Laramie.

The Government strenuously urges here that the Supreme Court, in United States v. Northern Pacific Railway Co., 311 U.S. 317, 61 S.Ct. 264, 85 L.Ed. 210, decided in 1940, has "overruled" the Fort Berthold, Assiniboine and Crow Nation cases of this court. Such a conclusion is not warranted.

By the Act of July 2, 1864, 13 Stat. 365, the United States authorized the Northern Pacific Railroad Company to build a railroad and telegraph line from Lake Superior to Puget Sound. A right of way through the public lands was granted to the railroad company, and the United States agreed to "extinguish, as rapidly as may be consistent with public policy and the welfare of the said Indians, the Indian titles to all lands falling under the operation of this act, and acquired in the donation to the [road] named in this bill." 13 Stat. 367. To aid in construction of the railroad, the company was also granted every alternate section of public land, not mineral, lying along the railroad line, in the amount of twenty sections per mile on each side of the line when passing through territories, and ten sections per mile through states. The grant was limited to lands to which "the United States have full title, not reserved, sold, granted, or otherwise appropriated, and free from preëmption, or other claims or rights, at the time the line of said road is definitely fixed." The company was given the right to select other lands in lieu of those excluded from the grant. 13 Stat. 367–368.

Many problems arose in the course of the construction of the railroad and in the determination of what lands the railroad was to receive. Finally, by the Act of June 25, 1929, 46 Stat. 41, the United States declared forfeited to the United States certain rights ·asserted by the company, and directed the institution of proceedings for the adjustment of the grant. Pursuant to that Act, suit was filed to settle the rights of the United States and the company.

One of the contentions of the Government was that the company should be charged with 13,300,000 acres of land which the Government said had been wrongfully received by the company because they lay within Indian reservations. The Government said that lands embraced by the Treaty of Fort Laramie and another Indian treaty, that of October 17, 1855, 11 Stat. 657, were excluded from the grant to the company by the language of the 1864 Act which excluded "reserved" lands, arguing that the Treaties of Fort Laramie and of 1855 "reserved" the lands described in it for the signatory Indian tribes.

The Supreme Court held the Government's contention unsound, and that the lands in question had not been "reserved", saying that the treaties "did not create technical reservations as have many other treaties and acts of Congress." 311 U.S. at page 349, 61 S.Ct. at page 279.

The Court discussed the treaties in the following language:

"By an Act of June 30, 1834, all lands lying west of the Mississippi River, not within the States of Missouri and Louisiana or the Territory of Arkansas, were designated as Indian country. The fee of all this territory was in the United States, subject to the Indian right of occupancy. The treaties of 1851 and 1855 did not alter the status of the lands described in them. The purpose of those treaties was to establish peace and amity between warring Indian tribes *inter sese* and between the tribes and the United States. To this end the country or territory of each tribe was described and the tribes agreed to respect the boundaries named in the treaties. No alteration in the status of the lands had occurred up to the date of definite location of the Northern Pacific's line. About seven hundred miles of the railroad traversed the area embraced in the treaties.

This language is not contrary to a conclusion that the Treaty of Fort Laramie constituted recognition by the United States of the Indians' title. That the purpose of the Treaty was to establish peace and amity is clear, as is also the fact that the fixing of the boundaries of *"the country or territory of each tribe"* was done for that purpose. As we have shown above, a basic element of United States policy was to secure peace by establishing the tribes' responsibility for depredations within their respective territories.

What the Supreme Court *held* in Northern Pacific was only that the Treaty of Fort Laramie had not established a *reservation* for the Indians. Establishment of a reservation is something more than recognition of title. Reservations normally involve such matters as schools, farm assistance, and so forth. The Supreme Court said

"As we have noted, the treaties did not create technical reservations as have many other treaties and acts of Congress. They did not set aside a defined territory for the exclusive use of a tribe nor contain the usual provisions for an Indian Agent for schools, assistance in farming operations, etc. The country described in the Treaty of 1851 amounts to 163,000,000 acres, and that described in the Treaty of 1855 to 37,000,000 acres. In the case of one of the tribes if the treaty were considered to create a technical reservation it would have allotted to each man, woman, and child in the tribe more than eighteen square miles." 311 U.S. at page 349, 61 S.Ct. at page 279.

Our conclusion that the Northern Pacific case decided only that the Fort Laramie treaty did not create a technical reservation is well supported by the careful discussion of the problem by the Supreme Court in the case of Northwestern Bands of Shoshone Indians v. United States, 324 U.S. 335, 65 S.Ct. 690, 89 L.Ed. 985, decided in 1945, less than five years after the decision in Northern Pacific. The question in the Northwestern Shoshone case was whether the Box Elder Treaty of July 30, 1863, 13 Stat. 663, had recognized the Shoshones' title. The Shoshones urged that the Box Elder Treaty was similar to the Treaty of Fort Laramie, and pointed to the Fort Berthold, Assiniboine, and Crow Nation cases in this court holding Fort Laramie to be a treaty of recognition.

The Supreme Court held, however, that the Box Elder Treaty did not recognize title. It distinguished the Treaty of Fort Laramie, stating, 324 U.S. at pages 349–350, 65 S.Ct. at page 697:

"the circumstances surrounding the execution of the Fort Laramie treaty indicate a purpose to recognize the Indian title to the lands described in the Fort Laramie treaty which may well have induced the Court of Claims to reach one conclusion in those cases [Fort Berthold, Assiniboine and Crow Nation] and another in this. For example, the instructions to the commissioners for the Fort Laramie negotiations contained this direction:

"It is important, if practicable, to establish for each tribe some fixed boundaries within which they should stipulate generally to reside, and each should agree not to intrude within the limits assigned to another tribe without its consent. * * * 71 Ct.Cl. 312. * * *

" 'The laying off of the country into geographical, or rather national domains, I regard as a very important measure, inasmuch as it will take away a great cause of quarrel among themselves, and at the same time enable the Government to ascertain who are the depredators, should depredations hereafter be committed.' * * *

"Furthermore, the words of the Fort Laramie treaty are more apt to express recognition of Indian title than those of Box Elder. Article 5 says:

" 'The aforesaid Indian nations do hereby recognize and acknowledge

the following tracts of country, included within the metes and boundaries hereinafter designated, as their respective territories, viz: * * * ' 71 Ct.Cls. 315.

In consideration of the treaty stipulations the United States bound itself to furnish supplies and to protect the Indian nations against depredations by its citizens. Such distinctions may quite justifiably have led the Court of Claims to different conclusions than it reached from consideration of the Northwestern Shoshone treaty."

Had the Northern Pacific case "overruled" or in any way brought into question the continuing validity of this court's decisions in Fort Berthold, Assiniboine and Crow Nation, the obvious thing for the Supreme Court in Northwestern Shoshone to have done would be to have pointed that out. It would have considerably strengthened the Court's consideration of the difference between the two treaties if the Court had noted that it had recently held that even the Treaty of Fort Laramie did not recognize title. The obvious answer to the Shoshones' contention that the Fort Laramie cases should govern the interpretation of Box Elder would have been that, since Northern Pacific, those cases were no longer good law.

The Supreme Court, far from citing Northern Pacific in that way, did not even mention the case, although it had been brought to the Court's attention both by the brief for the United States [4] and by the brief for the Shoshones.[5]

The Supreme Court in Northwestern Shoshone did, on the other hand, consider this court's decisions and opinions in Fort Berthold, Assiniboine and Crow Nation, and it gave express approval to the distinction which this court had drawn, in Northwestern Bands of Shoshone Indians v. United States, 95 Ct.Cl.

642, between the Fort Laramie and Box Elder Treaties.

We hold, therefore, that the evidence in this case, the prior decisions of this court, and the pronouncements of the Supreme Court of the United States support the conclusion that the Treaty of Fort Laramie recognized the title of the Crow Tribe in the lands which are here at issue.

### Res Judicata

 The Indians Claims Commission correctly decided that the issues involved in the case are not *res judicata* by reason of this court's decision in The Crow Nation v. United States, 81 Ct.Cl. 238.

The issues can only be *res judicata* if the same issues were or could have been litigated in the former suit. In this case, the Indians present their claim under clauses (3) and (5) of section 2 of the Indian Claims Commission Act, 25 U.S.C.A. § 70a, which provide that the Indian Claims Commission shall hear and determine

"(3) claims which would result if the treaties, contracts, and agreements between the claimant and the United States were revised on the ground of fraud, duress, unconscionable consideration, mutual or unilateral mistake, whether of law or fact, or any other ground cognizable by a court of equity; * * * and (5) claims based upon fair and honorable dealings that are not recognized by any existing rule of law or equity."

In the Crow Nation case, the Indians sued under the special jurisdictional act of July 3, 1926, 44 Stat. 807, which conferred jurisdiction on this court to adjudicate claims "arising under or growing out of" the Treaty of Fort Laramie, including claims for inadequate consideration received "under mistake of fact." The Indians argued in that case that, due to that fact that the Fort Laramie Trea-

---

4. Brief for the United States in Northwestern Bands of Shoshone Indians v. United States, No. 63, October Term, 1944, at page 28.

5. Brief for Petitioners, idem, at pages 41–43.

ty had never been communicated to the Department of State, they erroneously believed that it was not in effect, and, under this mistake of fact, were induced to accept inadequate consideration for their lands. As to this claim, the court decided against the Indians. But this is not the claim involved in this case. In this case, under the Indian Claims Commission Act, mistake of fact is not a requisite for recovery.

As to the issues which *are* involved in this case, the court in the prior Crow case stated clearly that it did not have jurisdiction of such issues, and was not deciding them. The court said:

"We can find nothing in the evidence to show that the Crow Indians were at any time misled as to the nature of their holdings under the treaty of 1851, but on the contrary, the evidence shows that they considered the reservation, so set apart in this treaty, as their lands and in all of their dealings with the Government, which resulted in the treaty of 1868, those speaking for the Crow Nation referred to it as their lands.

"However, under the Jurisdictional Act, this court is confined to claims arising under and growing out of the 1851 treaty and the treaty of 1868; both of these treaties set out the consideration to be paid by the Government. Under the Constitution, all treaties made under the authority of the United States are the supreme law of the land, and the question of the amount of the consideration and what entered into the negotiations are not for this court to determine. Both are political and not judicial matters.

\* \* \* \* \* \*

"It has been held repeatedly that the court cannot go behind a treaty, and that a treaty remains the supreme law of the land and that no court, either a court of law or of equity, can declare a treaty to have been procured by duress and fraud and therefore inoperative. The rights of the parties must be con-sidered and the legal and equitable rights determined under the terms of the treaty. We can find nothing in the evidence to justify the finding that any advantage was taken of the Indians so far as the consideration was concerned, or justify the conclusion that Congress intended by the jurisdictional act to submit to this court the question of its fair dealings with these Indians." 81 Ct.Cl. at pages 273–274.

The Indian Claims Commission was therefore correct in holding that the issues in this case are not *res judicata* by reason of the prior Crow case.

### The Commission's Jurisdiction

The Government also claims that the Indian Claims Commission was without jurisdiction over the instant claims, by reason of the provision of section 4 of the prior jurisdictional act that

*"with reference to all claims which may be the subject matter of the suits herein authorized,* the decree of the court shall be in full settlement of all damages, if any, committed by the Government of the United States and shall annul and cancel all claim, right, and title of the said Crow Indians in and to such money or other property."* [Emphasis added.] 44 Stat. 808.

However, as we have pointed out above, the claims involved in this case were not included within the area which could be the subject matter of the suits therein authorized. Therefore, the Commission did not lack jurisdiction of these claims by reason of that act and the adjudication thereunder.

### Valuation

■■ The Crow Tribe appeals from that part of the decision of the Indian Claims Commission which determines the 1868 value of the lands ceded by the Tribe at that time to have been $12,212,-305 for the 30,530,764.8 acres ceded, an average of $.40 per acre. The Tribe claims that substantial evidence supports a higher valuation.

The Tribe does not, however, attack any of the Commission's primary findings of fact as being unsupported by substantial evidence. The substance of the Tribe's argument is that the Commission should have drawn a different conclusion from the facts which it found.

We have examined the evidence in this case, and find that it supports the Commission's findings of fact. We also think that the findings support the Commission's ultimate finding as to value. This ultimate finding may not be the only one which could properly have been made, nor the one which we would have made had we to make the determination ourselves, but our function on appeals from the Indian Claims Commission is limited to determining whether the Commission's ultimate findings are supported by its primary findings. See The Miami Tribe of Oklahoma v. United States, Ct.Cl., 1960, 175 F.Supp. 926. We also think that the Commission's conclusions of law are valid and supported by its findings. 25 U.S.C.A. § 70s.

### Valuation of the Consideration Received by the Crow Tribe in 1868

The Crow Tribe points out that the Indian Claims Commission decided that the Tribe had received for its lands a sum of $1,644,585.49, which is the total of the amounts expended by the United States under the treaty. However, as we held in The Miami Tribe of Oklahoma v. United States, Ct.Cl., 1960, 281 F.2d 202, the consideration which the Indians receive, like the lands which they surrender, must be valued as of the date of the treaty. What the Crow Tribe received in 1868 was a promise to pay certain amounts in the future. Some of the payments were not made until as late as 1932. In order to determine the 1868 value of the payments which the Tribe received, an accountants' report, based upon figures obtained from the General Accounting Office, was introduced in evidence. That report revealed that the sum of money which, if put at 5% simple interest on May 7, 1868, the date of the treaty, would have amounted to $1,644,585.49 if disbursed in the amounts in which, and on the dates on which, it was actually expended, would be $1,111,768.-07. This, therefore, is the treaty date value of the consideration which the Tribe received for its lands.

We recognize, of course, that interest against the United States cannot be recovered in the absence of express statutory or contractual provisions, except in the case of an award of just compensation under the Fifth Amendment. We do not in this case award one cent of interest to the Indians. The Government argues that because, in order to determine the 1868 value of the payments actually made, an interest figure enters into the calculations, interest is being awarded. This is not so. The Indians are not being paid for the use of their money. Interest on the amount representing the value of their lands for which the Indians were not paid in 1868 would indeed be a considerable figure. All we do here is determine the value of what the Indians received in 1868. The fact that a figure representing interest must be used to calculate the 1868 value represented by a later payment does not make this an award of interest.

As we decided in the Miami case of 1960, supra, the treaty date value of the Government's payment is decisive. The treaty date value of its payment in this case was $1,111,768.07. The Indian Claims Commission erred in allowing a larger figure.

The Crow Tribe was entitled to receive $12,212,305 for its lands. It received $1,111,768.07, so it is entitled to the difference, in the amount of $11,100,536.93. The parties stipulated that the Government was entitled to counterclaims and offsets totaling $857,552.23, so the amount of judgment should be $10,242,-984.70. As thus modified, the decision of the Indian Claims Commission is affirmed, and the case is remanded to the Commission for the entry of an appropriate order.

It is so ordered.

DURFEE and LARAMORE, Judges, concur.

WHITAKER, Judge (dissenting).

The plaintiff tribe bases its right to recover on the primary proposition that prior to September 17, 1851, it had "occupied, possessed, and owned, and, for many years immediately prior thereto from time immemorial, had continuously held, occupied, possessed and owned" certain described land comprising 38,531,174 acres. It does not claim under any grant from the United States; for instance, because the lands were set apart to it as a reservation; its claim is based alone on aboriginal ownership, that is, exclusive use and occupancy from time immemorial. If this claim of exclusive use and occupancy from time immemorial is not sustained, then plaintiff's claim fails.

A mere claim to the lands along with other rival claimants is not sufficient to show aboriginal ownership, or "Indian title", as it is sometimes called; it must be exclusive use and occupancy. Alike an individual's claim of title to land by adverse possession, a claim of Indian title must be shown by possession adverse to all the world, to the exclusion of all the world. The Supreme Court in United States v. Santa Fe Pacific Railroad, 314 U.S. 339, at page 345, 62 S.Ct. 248, at page 251, 86 L.Ed. 260, said:

"Occupancy necessary to establish aboriginal possession is a question of fact to be determined as any other question of fact. If it were established as a fact that the lands in question were, or were included in, the ancestral home of the Walapais in the sense that they constituted definable territory occupied *exclusively* by the Walapais (*as distinguished from lands wandered over by many tribes*) then the Walapais had 'Indian title.'" [Italics mine.]

In order to prove that it had had exclusive use and occupancy of these lands from time immemorial the plaintiff tribe relies alone on the Treaty of Fort Laramie of September 17, 1851, and the Indian Claims Commission bases its decision alone on the terms of this treaty. I do not think the treaty shows plaintiff

had exclusive use and occupancy from time immemorable.

The treaty is set out in the opinion of the majority. I call particular attention to Article 5 thereof. It reads in part:

"The aforesaid Indian nations do hereby recognize and acknowledge the following tracts of country, included within the metes and boundaries hereinafter designated, as their respective territories, viz: * * *"

Then follows a rough description of the territories assigned to each tribe, and the article continues:

"It is, however, understood that, in making this recognition and acknowledgement, the aforesaid Indian nations do not hereby abandon or prejudice any rights or claims they may have to other lands; *and further that they do not surrender the privilege of hunting, fishing, or passing over any of the tracts of country heretofore described.*" [Italics mine.]

Several tribes were parties to this treaty, the Sioux, the Cheyennes, the Arrapahoes, the Crows, and perhaps another tribe or two. The treaty dealt with 163,000,000 acres of land. All the named tribes roamed over this vast domain at will. No one of them claimed any particular part of it, but each of them claimed the right to hunt and fish and otherwise use and enjoy the entire area. Warfare between the tribes was not infrequent because each of them claimed an equal rights in the lands. No one of them exercised *exclusive* use and occupancy over any part of them.

The Fort Laramie Treaty recognized that each tribe claimed rights in the entire 163,000,000 acres, because in Article 5, which set apart portions of the 163,000,000 acres to each tribe, it was nevertheless provided "the aforesaid Indian nations * * * *do not surrender the* privilege of hunting, fishing, or passing over any of the tracts of country heretofore described." [Italics mine.]

It seems to me impossible to maintain that plaintiff tribe has shown exclusive use and occupancy from time immemorial of the acreage for which they sue, in view of Article 5 of the Fort Laramie Treaty. If they have not, they have not made out the case stated in their petition. They have not shown that they were the owners of the property on account of which they sue.

Parties must prove the case stated in their petitions. That is the case the defendant is called on to defend. It is not called upon to defend against a claim the plaintiff might have made but which it did not assert in the petition. But if we suppose that plaintiff had asserted a claim growing out of the Fort Laramie Treaty, instead of one recognized by it— that it acquired rights under that treaty which it had not had before—what is the result?

This court has previously considered this question and has decided that the Fort Laramie Treaty did set apart reservations for the respective tribes. The first case was Fort Berthold Indians v. United States, 71 Ct.Cl. 308. In that case, we held that the treaty set aside reservations for the Indians who were parties to the Fort Laramie Treaty, and judgment was granted "upon the basis of the amount they [the Indian tribe] might have obtained for the large areas at the time they were taken." This was followed in Assiniboine Indian Tribe v. United States, 77 Ct.Cl. 347. In Crow Nation v. United States, 81 Ct.Cl. 238, in which the tribe was suing under a special jurisdictional act, the question was not raised, but the case was tried on the assumption that the Fort Laramie Treaty did create a reservation for plaintiff. The same is true in Blackfeet, et al., Nations v. United States, 81 Ct.Cl. 101, under a similar treaty.

None of these cases went to the Supreme Court. However, the question of what rights the Indians acquired under the Fort Laramie Treaty was considered and decided by the Supreme Court in United States v. Northern Pacific Ry. Co., 311 U.S. 317, 61 S.Ct. 264, 278, 85 L.Ed. 210. The question presented in that case was whether the grant of public lands to the railway by the act of July 2, 1864, embraced lands said to be reserved to the several Indian tribes by the Fort Laramie Treaty. The railway claimed that the lands were not Indian reservations, but public lands; but the Attorney General filed a bill in the District Court for the Eastern District of Washington, alleging in paragraph XXIX that the grant expressly excepted reserved lands and that the Fort Laramie Treaty had set aside these lands as a reservation for the Indians, and they were Indian reservations at the time of the grant to the railway in 1864.

The railway demurred to this part of the bill. The matter was referred to a special master, who held in an extensive opinion that the treaty did not create Indian reservations. He said the purpose of the treaty was to establish peace between the tribes and the United States and between the several tribes, and nothing more. The District Court affirmed, as did also the Supreme Court.

We quote from the Supreme Court's opinion at some length:

"Paragraph XXIX of the bill alleges that by treaties of September 17, 1851, and October 17, 1855, the United States 'reserved' certain lands for Indian tribes. * * *

"In accordance with the master's recommendation, the court below sustained the motion to dismiss paragraph XXIX on the ground that the lands in question were granted to the company by the Act of 1864 and the Resolution of 1870. We think the court was right.

"By an Act of June 30, 1834, all lands lying west of the Mississippi River, not within the States of Missouri and Louisiana or the Territory of Arkansas, were designated as Indian country. The fee of all this territory was in the United States, subject to the Indian right of occupancy. The treaties of 1851 and 1855 did not alter the status of the lands described in them. The pur-

pose of those treaties was to establish peace and amity between warring Indian tribes *inter sese* and between the tribes and the United States. To this end the country or territory of each tribe was described and the tribes agreed to respect the boundaries named in the treaties.
* * *

"Section 3 limits the land grant to lands as to which the United States 'have full title, not reserved, sold, granted, or otherwise appropriated, and free from preemption, or other claims or rights, at the time the line of said road is definitely fixed, * * *.' The Government contends that this section excludes lands embraced within the treaty limits for the reason that the treaties 'reserve' all the lands described in them for the signatory Indian tribes. We think the contention is unsound.

"As we have noted, the treaties did not create technical reservations as have many other treaties and acts of Congress. They did not set aside a defined territory for the exclusive use of a tribe nor contain the usual provisions for an Indian Agent for schools, assistance in farming operations, etc. The country described in the Treaty of 1851 amounts to 163,000,000 acres and, that described in the Treaty of 1855 to 37,000,000 acres. In the case of one of the tribes, if the treaty were considered to create a technical reservation it would have allotted to each man, woman, and child in the tribe more than eighteen square miles.[1]"

The special master, the District Court, and the Supreme Court had before them the opinions of this court in the Fort Berthold and the Blackfeet cases, supra. Their opinions are in direct contradiction to what we said in the Fort Berthold case, and assumed in the Blackfeet case.

The case then comes down to this: The Fort Laramie Treaty did not recognize that the Crows had had from time immemorial exclusive use and occupancy of the area set apart to them under the Fort Laramie Treaty, and it did not create a reservation for the plaintiff tribe. However, I do think the Fort Laramie Treaty did give to each Indian tribe something it had not had before.

Before the Treaty, each of the tribes, the Sioux, the Cheyennes, the Arrapahoes, and the Crows were rival claimants to the entire 163,000,000 acres. By the Treaty this 163,000,000 acres were divided up and portions were set apart to each tribe. No tribe had the exclusive right to the use and enjoyment of the part set apart to it, but it did have sort of a prior right therein. But by no stretch of the imagination could it be asserted that it was intended by the treaty to give to each tribe title to the vast domain set apart to each. As pointed out by the Supreme Court in the Northern Pacific case, supra, in the case of one of the tribes this would have given to each man, woman and child more than 18 square miles, about one-fourth of the area of the city of Washington. The area set apart to plaintiff tribe is larger than the State of Ohio. It could not have been intended to vest in them title to such a vast domain. So far as I can see, all they received under the treaty was a better right to hunt and fish in the area set apart to them than the other tribes had.

For the deprivation of this right, it may be they are entitled to compensation, but that compensation is certainly much less than that payable for the taking of lands to which plaintiff tribe had title or the right to exclusive use and enjoyment. The Indian Claims Commission and the majority thought 40 cents an acre was fair compensation for the taking of title. The tribe was paid .054 an acre for what was taken. I think this was fair com-

1. It is of interest to note that 163,000,000 acres is an area larger than that of any state in the United States, except only Alaska and Texas. The amount of 8,000,000 acres set apart by the treaty of 1868 as a reservation for the Crow Indians is larger than the states of Massachusetts and Rhode Island combined, and the 30,000,000 acres is larger than the state of Ohio.

pensation for what the tribe had and what the defendant took.

So, even if we consider the case the tribe might have made, it still has not shown that the consideration paid was unconscionable. Hence, the Indian Claims Commission should have dismissed its petition.

For these reasons I dissent.

I am authorized to say that Chief Judge JONES joins in this dissent.