Whauet, Judge,,
delivered the opinion of the court:
This suit is brought by the Crow Nation or Tribe of Indians of Montana under the special jurisdictional act approved July 3, 1926 (44 Stat. 807), as set out in full in finding I. The act confers jurisdiction on the Court of Claims, with an appeal to the Supreme Court, “ to hear, adjudicate, and render judgment in any and all claims arising under or growing out of the treaty of Fort Laramie, dated September 17, 1851 (Second Kappler, page 594), between the United States and the Crow Indian Nation and the treaty dated May 7, 1868 (Fifteenth Statutes, page 649), between the United States and the Crow Indian Nation, or arising under or growing out of the Executive order dated July 2, 1873 (First Kappler, page 855), or any subsequent Executive order, the act of Congress approved April 15, 1874 (Eighteenth Statutes, page 28), or any subsequent act of Congress or agreement with said Crow Indian Nation, which said Crow Indian Nation or any branch thereof may have against the United States, * * * ; and jurisdiction is hereby conferred upon the said courts to determine whether or not any provision in any such treaty or Executive order has been violated or breached by any act or acts *270 of Congress or by any treaty made by the United States with any other Indian tribe or nation, and if so, to render judgment for the damages resulting therefrom.”
The plaintiff filed its petition in this court on June 13, 1927, seeking to recover on numerous claims, some of which have been abandoned in the brief and others are connected with and involved in the four major claims which will be considered separately.
The jurisdiction of this court is confined to claims “ arising under ” or “growing out ” of the two treaties; the Executive order of 1873 or any subsequent Executive order, or agreement made with the Crow Indian Nation, and to determine if any provision in any such treaties or acts of Congress has been “ violated ” or “ breached ” by “ any act or acts of Congress ”, or if any treaty made by any other Indian Nation with the United States has violated or breached any such treaties or acts of Congress with the Crow Nation.
Treaties made prior to 1851 are not within the sphere of this act and can afford no aid in its application.
Suffice it to say, the relations! of the Crow Indians and the citizens of the United States were always amicable. The Crow Scouts often assisted the Army in its operations against hostile tribes. The Government valued the friendly relations of this Indian tribe. With this brief outline we come to the merits of the case.
The first claim is that for additional consideration for 30,530,764.8 acres of land taken over by the Government under the treaty of 1868, representing the amount by which plaintiff’s reservation under the Fort Laramie treaty of September 17, 1851 (11 Stat. 749), was diminished by the treaty of 1868 which reduced the reservation to 8,000,409.2 acres. The plaintiff claims a failure of consideration through a mistake of fact, as to the ratification of the treaty of 1851, causing the Crow Indians to cede this large territory for an inadequate price. The claim is made for the difference amounting to some $30,000,000.
(a) As an alternative to this claim, should it not be allowed, the plaintiff alleges that under the 1868 treaty the Liver Crows, not being a party to the treaty, were deprived of their interests in the reservation granted by the treaty *271 of 1851, that their interests represented 40% of the true value of the land, and therefore they are entitled to the sum of some $12,000,000.
(5) There is also alleged, in the nature of a second alternative, a claim for the River Crows for the value of the alleged interests of these Indians in the lands north of the Missouri River set aside by Executive order in 1873-1875 to the Indians composing the Blackfeet Nation and the River Crows.
(2) A claim is made for the Crows for deficiencies in annuities under the treaty of September 17, 1851.
(3) A claim is made for alleged losses, due to the negligence and mismanagement of the Government, through its agents and officers, of the tribal herd of cattle.
(4) There is a claim for the loss through a bank failure and for certain tribal funds, allegedly unlawfully expended by the Indian agent, in the sum of $24,196.61.
CLAIM i
The first issue raised is the most important question in this case. It appears that the Crow Nation entered into a treaty with the United States in 1851, along with other Indian nations, known as the “Fort Laramie Treaty”, in which the Government set aside a reservation of some 38 million acres to the Crow Nation. The territory reserved for this Indian nation was situate in what are now the States of Montana and Wyoming. When this treaty was submitted to the Senate, an amendment was made reducing the number of years in which the annuities were to be paid, and, as so amended, was ratified by the Senate. This treaty, as amended, was returned to the tribes concerned and the assent in writing of all of them in due course was secured, that of the Crow Nation on September 18, 1854. Through some error in the Department, the ratification of this treaty by the Indians was never promulgated, and for a number of years the officials of the Government labored under the impression that there had been no ratification of this treaty by the Indian tribes, parties thereto; however, during the period from 1851 to 1866 and until sometime thereafter, *272 the Congress of the United States appropriated each year the sum called for in the treaty, and the amount so appropriated was applied to and used by the Indian nations.
In the case of the Fort Berthold Indians v. The United States, 71 C. Cls. 308, this court decided that the treaty entered into between the United States and these Indian tribes in 1851, and known as the “Fort Laramie Treaty”, was duly ratified by the Indians and was an existing and binding treaty on all parties thereto; that under this treaty the Indians received the reservation of the lands described therein and the Government recognized their right of occupancy to the lands so reserved.
In the Fort Berthold case, supra, the lands, set aside as a reservation under the Fort Lamarie Treaty of 1851, were taken by the Government without compensation to the Indian tribe or cession by them. There has been no taking of any lands from the Crow Indians. In every instance a cession by them has been made to the Government for a consideration, and to certain railroad companies also for a consideration, with the consent and approval of the Government.
The plaintiff claims that, due to an error on the part of the Government officials in recognition of this treaty, the Indians were misled as to their rights in the lands of the treaty of Fort Laramie when they came to make the treaty of 1868, and, that under section 4 of the jurisdictional act, if the United States have “ obtained lands from the Crow Indians for an inadequate consideration under mistake of fact, damages therefor shall be confined to the value of the money or their property at the time of such appropriation * * * ”; that the failure of recognition of the ratification of the treaty of 1851 by the Government officials was such a mistake of fact that it misled the Indians into parting with that portion of their lands given to them by the Government under the 1851 treaty and delimited by the treaty of 1868 (15 Stat. 649, 652), for a consideration much less than they would have demanded and received, had the Government recognized the ratification of the treaty of 1851 and acknowledged the rights of the Indians in the reservation set aside by this treaty. We can find no merit in this contention. The *273 evidence does not disclose that the Indians were misled or that any fraud was committed upon them. As a matter of fact, no fraud is alleged, only a general charge that the Indians, through the actions of the officials of the Government in not promulgating the treaty of Fort Laramie as having been duly ratified by the Indians upon the amendment made by the Senate, were not acquainted with their rights under the treaty of 1851. However, during all of this period, the Indians were receiving from the Government the amounts stated in the treaty; so far as the Congress was concerned the terms of the treaty were carried out fully. During all these years the Crow Nation lived on the reservation so set apart under the treaty, although a small band known as the River Crows wandered from the reservation and lived on the Milk River in the territory of the Upper Missouri River. This band of Crows lived most of the time off the reservation in the territory of the Blackfeet and Piegans and other tribes on the upper Missouri River but returned to the reservation from time to time. We can find nothing in the evidence to show that the Crow Indians were at any time misled as to1 the nature of their holdings under the treaty of 1851, but on the contrary, the evidence shows that they considered the reservation, so set apart in this treaty, as their lands and in all of their dealings with the Government, which resulted in the treaty of 1868, those speaking for the Crow Nation referred to it as their lands.
However, under the Jurisdictional Act, this court is confined to claims arising under and growing out of the 1851 treaty and the treaty of 1868; both of these treaties set out the consideration to be paid by the Government. Under the Constitution, all treaties made under the authority of the United States are the supreme law of the land, and the question of the amount of the consideration and what entered into the negotiations are not for this court to determine. Both are political and not judicial matters.
In United States v. Old Settlers, 148 U. S. 427, 468, the court said:
“ Unquestionably a treaty may be modified or' abrogated by an act of Congress but the power to make and unmake is essentially political and not judicial, and the presumption *274 is wholly inadmissible that Congress sought in this instance to submit the good faith of its own action or the action of the Government to judicial decision, by authorizing the stipulations in question to be overthrown upon an inquiry of the character suggested, and the act does not in the least degree justify any such inference.”
It has been held repeatedly that the court cannot go behind a treaty, and that a treaty remains the supreme law of the land and that no court, either a court of law or of equity, can declare a treaty to have been procured by duress and fraud and therefore inoperative. The rights of the parties must be considered and the legal and equitable rights determined under the terms of the treaty. We can find nothing in the evidence to justify the finding that any advantage was taken of the Indians so far as the consideration was concerned, or justify the conclusion that Congress intended by the jurisdictional act to submit to this court the question of its fair dealings with these Indians.
It may be reiterated, as declaratory of the good faith of Congress, that Congress made appropriations in fulfillment of the treaty of 1851, and distributed them to the plaintiff Indians, and there is no satisfactory proof of any shortage in distribution.
Under the provisions of the treaty of 1868, the United States agreed to expend sums of money for the benefit of the Crows for various periods and for various and special purposes, the indefinite amounts to be determined by the United States from time to time as contingencies and necessities should arise. In compliance with the obligations thus assumed, Congress disbursed for the benefit of the Crows $1,499,866.16. This amount was the consideration which went to the Crow Nation for the cession of the 30,000,000 acres delimited from the 1851 reservation. Both from a factual and jurisdictional standpoint, there can be m> recovery on this claim.
ALTERNATIVE CLAIM A
The next important question (claim A) which plaintiff makes is that a small tribe of the Crow Nation consisting of 40% of the population of the whole Crow Nation left *275 the reservation and lived on the upper Missouri River and was not a party to the treaty of 1868, and, therefore, the interests of this tribe were never ceded to the United States under the treaty of 1868. We will consider this question, from the position taken in the plaintiff’s brief, although we do not believe it merits serious consideration. This claim is necessarily based on the title which the Indians derived under the 1851 treaty to the lands set apart as a reservation. It is well-settled law and does not require a citation of authority that the title derived by an Indian tribe, through the setting apart of a reservation, depends entirely upon the terms of the treaty which is entered into between the parties, and that, where there is simply a reservation set apart for the Indian Nation, no fee simple or base fee is granted to the tribe, but only a right of occupancy.
In Spalding v. Chandler, 160 U. S. 894, 402, the court said:
“ It has been settled by repeated adjudications of this court that the fee of the lands in this country in the original occupation of the Indian tribes was from the time of the formation of this Government vested in the United States. The Indian title as against the United States was merely a title and right to the perpetual occupancy of the land with the privilege of using it in such mode as they saw fit until such right of occupation had been surrendered to the Government. When Indian reservations were created, either by treaty or Executive order, the Indians held the land by the same character of title, to wit, the right to possess and occupy the lands for the uses and purposes designated.”
There is nothing in the treaty to show that anything but an occupancy title was vested in the Crow Nation in the reservation set aside by the 1851 treaty. It is true that a tribe of the Crow Nation roamed from the reservation and lived on the upper Missouri River but the evidence shows that they returned from time to time, either as individuals, or as a tribe to the reservation, and that when the treaty of 1868 was negotiated, one of the chiefs of the River Crows, Wolf Bow, was present, both at the first meeting in 1867 when the terms of the treaty were agreed upon, and when the treaty was signed the following spring in 1868. He *276 signed the treaty. The treaty states that it is made by the Commissioner on the part of the United States and “ the undersigned chiefs, headmen of and representing the Crow Indians, they being duly authorized to act in the premises.”
Irrespective, however, of the nature of the title the Indians derived from the 1851 treaty, there is no showing that when the Congress ratified this treaty, it recognized two tribes, one known as the Mountain Crows and the other as the River Crows. The Senate subsequently refused to ratify a separate treaty with the River Crow Indians but did ratify the treaty with the Crow Tribe of Indians. The Senate resolution ratifying the treaty referred to the “ Crow Indians of Montana Territory ” and the preamble of the President’s proclamation of the treaty refers to the “ chiefs and headmen of the Crow Tribe of Indians.” (15 Stat. 649, 653.) The clear import of these words is inconsistent with the assertion that only a part of the tribe was a party to the treaty. Agreements were made with the whole Crow Tribe, subsequently, which were ratified by Congress on April 11, 1882 (22 Stat. 42) ; July 10, 1882 (22 Stat. 157). In these agreements reference is made to the treaty of May 7, 1868; namely, that the said treaty was with the Crow Indians and uniformly throughout all of these acts of Congress, the Crow Indians are treated as a unit, not as separate tribes to be dealt with separately and 'both the River Crows and the Mountain Crows alike joined in these agreements, which show that by their acts the treaty of 1868 was with the Crow Nation. By 1880, the River Crows had returned to the reservation in Montana and after that year remained there. Many, if not all, of the River Crows received the annuities and benefits contained in the 1868 treaty, and the few who did not receive these benefits while absent, when they returned to the reservation, became recipients. In the entire dealings of the Congress with this Indian nation, there was never, except as hereinafter indicated, a recognition of any separation into parts or acknowledgment of any such terms as “ River Crows ” and “ Mountain Crows.” Congress invariably dealt with them as one tribe, or nation, and although they may have at times been *277 otherwise referred to by officials, in no instance, except one, were they ever officially recognized as separate entities.
The plain intendment of this claim is for this court to say that the treaty of 1868 was made with a part of the Crow Tribe, namely, only with the Mountain Crows. The treaty names the Crow Tribe of Indians. To hold that the words “ Crow Tribe of Indians ” mean “ Mountain Crows ” would be a material alteration of the treatj? which is beyond the power of the judiciary. Congress alone can make a treaty and once made the courts cannot “ alter, amend, or add to any treaty, by inserting any clause, whether small or great, important or trivial ”; nor can a cams omissus in a treaty be supplied. Congress made the treaty with the Crow Tribe of Indians and this court cannot, and has no power to, say it was with only a part of the tribe. The Amiable Isabella. 6 Wheat. 1, 71, 72.
ALTERNATIVE CLAIM B
In alternative claim B is the only instance where the Congress has recognized the Elver Crows as a separate tribe.
From 1851 to 1859 the entire Crow Nation lived upon the reservation as set apart in the Treaty of Fort Laramie. Commencing with the year 1859 a small band of the Crow Nation left the Crow Eeservation from time to time and went to a territory on or near the Missouri Eiver and its north tributary, the Milk Eiver. This tribe or band from then on began to be known as the Eiver Crows.
There was no abandonment by this tribe of Eiver Crows of their rights and interest in the reservation as set out in the treaty of 1851 because they returned from time to time, and some of them remained. Members of the Mountain Crows, that is, those who remained on the reservation, visited the Eiver Crows from time to time. This small band of Eiver Crows some time prior to 1878 joined with the Gros Ventre Indians with whom they were friendly and occupied with them a portion of the lands of the Blackfeet Nation, north of the Missouri Eiver. The lands occupied by the Eiver Crows were no part of the Crow Eeservation but were lands belonging to other Indians and the United States. The *278 Government did not at any time consent to this tribe leaving the Crow Reservation but endeavored by persuasion to have the whole tribe consolidated, and employed every peaceful means to induce the River Crows to remain on the reservation. This small tribe, being addicted to liquor drinking and the pleasures of fishing, persisted in remaining on the Missouri River.
In 1871 Congress declared that thereafter no Indian nation or tribe should be recognized as an independent nation, tribe, or power with whom the United States could contract by treaty (16 Stat. 544).
In 1873 the President by proclamation set apart a large area as a reservation for the Gros Ventres, Piegans, Bloods, Blackfeet, River Crows, “ and such other Indians as the President may, from time to time, see fit to locate thereon.” This reservation was situate north of the Missouri River and a large part of it was land set apart by treaty to the Blackfeet Nation. All of these tribes, with the exception of the River Crows, named in the Executive order, composed the Blackfeet Nation. The Blackfeet Nation v. The United States, No. E-427, decided December 4, 1933 [Final decision April 8,1935; ante, p. 101]. The River Crows had their own reservation along with the Mountain Crows and the two tribes composed the Crow Nation; the order of 1873 and the act of Congress of 1874 gave to the River Crows only the right to reside upon the reservation, so set apart by Executive order, and did not confer upon them any definite title or particular interest in the land. It was in the nature of a tenancy by sufferance or residential title. The object and aim of it was to prevent hostilities among the tribes hunting and fishing in this territory, and to control the liquor traffic on the Missouri River. This recalcitrant tribe, which had removed from its own reservation, gave nothing as a consideration for any interest in this new reservation. In all subsequent proclamations of the President which were ratified by acts of Congress the River Crows were never recognized as having an interest in the area so set apart by this Executive order of 1873. It was simply a license or permission granted by the Government which could be withdrawn and ceased to exist when the River Crows returned to *279 the Crow Nation Reservation. The Executive order reserves to the President the right to put other Indians on the reservation and this could not be done if a statutory title, as tenants in common, was given to these five tribes alone.
In 1879 the River Crows finally returned to their reservation and from then on remained thereon. There is nothing-in the proclamation of the President and the acts of Congress ratifying the permission to reside on the reservation north of the Missouri River, to show more than a temporary residence; and the greater part of the lands so set apart as a reservation to the Gros Ventres, Piegans, Bloods, Blackfeet, River Crows, and other Indians was taken subsequently for the public domain by the agreements of 1886 (24 Stat. 29, 44) and 1887 (25 Stat. 113), and ratified in 1888. The record does not disclose the exact period when the Assini-boines and Sioux Indians were placed on this reservation, but they were residing there after the River Crows had departed and when the 1886-1888 agreements were made. The agreements were made with the tribes on the reservation at the time. The designation of the territory as a “ reservation ” of the Gros Ventres, Piegans, Bloods, Blackfeet, and River. Crows was descriptive only, and carried no' title to the lands other than the right to reside thereon, and this right disappeared upon removal therefrom. On the other hand, from 1880 the River Crows, together with the Mountain Crows, as the Crow Nation, joined in several cessions of land and accepted the benefits thereof and received allotments in severalty. There is nothing in the evidence to show that this reunion was brought about by any act of force on the part of the Government. The Government was desirous of the union of the two tribes, and used moral persuasion to bring the River Crows back to their reservation, but no coercion was used. From the time the River Crows returned to the Crow Reservation, and thereafter, agreements were made with other Indian tribes as above stated, and acts of Congress passed confirming the said agreements, whereby portions of the 1873-1875 reservations were disposed of. The Blachfeet Nation v. The United States, supra, and the Assiniboine Tribe of Indians v. The United States, decided April 10, 1933, 77 C. Cls. 347. *280 This shows a clear intention by Congress and the executive departments that the River Crows were to take no interest in this reservation, and their abode thereon ivas solely a temporary expedient in order to avoid bloodshed and to regulate the liquor traffic on the Missouri River.
It is significant that the record shows that no treaties or agreements have been made separately with a branch or tribe of the Crow Nation, and the United States has never recognized any treaty or agreement with the River Crows as a separate political entity.
During the visits of the River Crows to the Crow Reservation they participated in the annuities and drew subsistence allowances as provided in the terms of the treaty of May 7, 1868.
From 1880, when the two bands had been reunited, cessions were made out of the 1868 reservations. In 1882 Congress ratified a cession of approximately 1,559,000 acres in consideration of the annual appropriation for 25 years of $30,000 to be expended for the benefit of the Crow Indians (22 Stat. 42). Again, in 1882 the Congress ratified the cession of 5,650 acres for the use of the Northern Pacific Railroad Company in consideration of $25,000 (22 Stat. 157). In 1887 Congress authorized the cession to the Rocky Ford and Cook City R. R. Co. of a right of way (24 Stat. 545), and another in 1889 was authorized by Congress for the use of the Big Horn Southern Railroad Co. (25 Stat. 660). In 1891 Congress ratified the cession of over one million acres for the consideration of $946,000 to be disbursed for the benefit of the Crows (26 Stat. 989, 1040). Another cession was ratified by Congress in 1904 of over a million acres, being the northern part of the Crow Reservation, with the stipulation that the ceded lands should be sold to the United States and the proceeds paid to the Indians (33 Stat. 353).
All other treaties and all other agreements made by the United States with the Crow Indians were made with the whole Crow Nation.
It is clear from what has been said above, in reference to the numerous treaties, executive orders and acts of Congress, that the uniform policy of the President and Congress was *281 not to enlarge the land holdings of the River Crows, when they had a reservation of their own on the Yellowstone River which was much greater than their needs as is shown by the many cessions of parts of their territory made by the whole Crow Nation after the River Crows had returned to their reservation. The policy .of the Government in dealing with the Indians was not to recognize more than one reservation to any one tribe or nation.
The amount of the set-offs shown in the findings so far exceeds all other claims that, even if these claims were allowed, no recovery could be had. It is therefore unnecessary to pass on them separately.
The petition is dismissed. It is so ordered.
Williams, Judge; LittletoN, Judge; GeeeN, Judge; and Booth, Chief Justice, concur.