UNITED STATES of America, Plaintiff-Appellant,

v.

James Junior FINCH, Defendant-Appellee.

No. 75–2149.

United States Court of Appeals, Ninth Circuit.

Dec. 22, 1976.

Rehearing En Banc Denied March 3, 1977.

Keith L. Burrowes, Asst. U. S. Atty. (argued), Billings, Mont., for plaintiff-appellant.

Robert W. Holmstrom (argued), of Longan & Holmstrom, Billings, Mont., for defendant-appellee.

Before CHAMBERS and KENNEDY, Circuit Judges, and WONG,* District Judge.

KENNEDY, Circuit Judge:

This case began when James Junior Finch stood on a bank of the Big Horn River and cast a fishing lure into the waters. He was charged by information with trespassing on Indian lands, a violation of 18 U.S.C. § 1165. The bank and the bed of the Big Horn River at the point where Finch stood lie within the exterior boundaries of the Crow Indian Reservation. All concede that the State of Montana owns the bank at that spot, having acquired the property by purchase. The state's chain of title can be traced to a Crow Indian who acquired the land by allotment.

Finch held a fishing license issued by the Montana State Fish and Game Commission. However, he was not a member of the Crow Tribe, and he was well aware of an ordinance promulgated by the tribe that forbade all persons who were not tribal members from entering Crow lands for fishing. The district court found that no entry had been made on Indian land and dismissed the information. 395 F.Supp. 205 (D.Mont. 1975). The Government appeals.[1]

The court below originally denied a motion by the defendant to dismiss the information. The Government and the defendant stipulated to an "Agreed Statement of Facts" and submitted the case for the court's determination. The trial court thereupon reconsidered its earlier ruling and entered an order dismissing the information. Finch asserts that submitting the stipulation of facts to the court put him once in jeopardy, and that we do not have jurisdiction over the Government's appeal because a reversal would place him in jeopardy a second time. We address this jurisdictional issue before reaching the merits.

## I

■ Our jurisdiction of the appeal by the Government is controlled by 18 U.S.C. § 3731. That statute authorizes appeals by the Government from all district court orders dismissing an indictment or information, except where the appeal would be barred by the double jeopardy clause of the Constitution. The Supreme Court recently gave careful consideration to this statute and concluded that its enactment expresses a congressional intent to "avoid creating nonconstitutional bars to the Government's right to appeal." *United States v. Wilson,* 420 U.S. 332, 339, 95 S.Ct. 1013, 1019, 43 L.Ed.2d 232 (1975). Our jurisdictional inquiry, therefore, must focus on whether the appeal is barred by the constitutional rule against double jeopardy. *United States v. Patrick,* 532 F.2d 142 (9th Cir. 1976).

■ The threshold question is whether the defendant was once placed in jeopardy by the proceedings below. There are no mechanical rules for deciding whether jeopardy has attached. As the Supreme Court has declared, the phrase is used to mark that "point in [the] criminal proceedings at which the constitutional purpose and policies" of the double jeopardy clause become implicated. *Serfass v. United States,* 420 U.S. 377, 388, 95 S.Ct. 1055, 1062, 43 L.Ed.2d 265 (1975), citing *United States v. Jorn,* 400 U.S. 470, 480, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971). In this case, we believe that jeopardy attached in the proceedings below.

■ Appellee's initial motion to dismiss was denied. The parties then filed an "Agreed Statement of Facts."[2] The stipulation was a submission of the case to the

---

* Honorable Dick Yin Wong, United States District Judge for the District of Hawaii, sitting by designation.

1. While this controversy is between the United States and appellee Finch, the Crow Tribe and the State of Montana have each filed briefs as *amici curiae.*

2. The statement ended with the following paragraph:

 It is . . . agreed that this matter is hereby submitted to the court for its decision without further proof unless the court should desire proof on any point or points not covered herein to the satisfaction of the Court.

district court for plenary determination and decision. This stipulation constituted a waiver of a jury trial; after it was filed, the district court undoubtedly had the power to determine the guilt or innocence of the defendant. The agreed statement of facts, moreover, was relevant to the district court's ultimate decision to dismiss the information. In the trial court's opinion announcing that it had reconsidered the earlier motion to dismiss, the court expressly stated: "After a thorough review of the file, I am compelled to reconsider my order . . . ." 395 F.Supp. at 207.

In at least two essential respects, this case differs from *Serfass v. United States, supra,* in which the Supreme Court held that jeopardy had not attached. In *Serfass,* the petitioner had not waived his right to trial by jury (in fact, he had requested a jury trial), and the district court had no power to determine the petitioner's guilt or innocence. By contrast, the defendant here waived his right to a jury trial, and after the initial denial of his motion to dismiss, was subject to the risk of a determination of guilt.

■ This case is also distinguishable from *United States v. Choate,* 527 F.2d 748 (9th Cir. 1975), *cert. denied,* 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976). In that case, defendant waived a trial by jury, and the trial court received two stipulations of fact. Thereafter, the lower court granted the defendant's pretrial motion to dismiss on the ground that government agents had acted improperly. The Government appealed the dismissal, and the defendant argued that the waiver of the jury trial, coupled with receipt of the stipulations of fact, had placed him in jeopardy. We held that jeopardy had not attached. We reasoned that the factual stipulations received by the district court were not considered in its ruling on defendant's pretrial motion and that the parties clearly understood that the lodging of the stipulations had not put appellee in jeopardy. 527 F.2d at 751. In essence, the

district court in *Choate* had no power to find the defendant guilty until it first ruled on the pretrial motion, and thus the defendant was not subject to the risk of a determination of guilt. *Choate* thus differs from this case in at least two respects: the parties in *Choate* had no expectation that the stipulations of fact would place the defendant in jeopardy and the trial court's ruling on the motion to dismiss in *Choate* was entirely unrelated to the factual stipulations. In light of the foregoing discussion, we conclude that in this case jeopardy attached at the time the case was submitted to the district court for decision.[3] *Cf. United States v. Patrick, supra.*

■ This finding, however, does not necessarily preclude appellate jurisdiction, for "the conclusion that jeopardy has attached begins, rather than ends, the inquiry as to whether the Double Jeopardy Clause bars retrial." *Illinois v. Sommerville,* 410 U.S. 458, 467, 93 S.Ct. 1066, 1072, 35 L.Ed.2d 425 (1973), *quoted in Serfass v. United States,* 420 U.S. at 390, 95 S.Ct. 1055; *United States v. Patrick,* 532 F.2d at 146; *see, e. g., United States v. Wilson,* 420 U.S. 332, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975); *United States v. Kehoe,* 516 F.2d 78 (5th Cir. 1975), *cert. denied,* 424 U.S. 909, 96 S.Ct. 1103, 47 L.Ed.2d 313 (1976). Accordingly, the next step is to determine the effect of the procedures that would take place on remand were the reviewing court to decide the merits of the appeal adversely to the defendant. Where these procedures are such that an individual who has once been placed in jeopardy will be put in jeopardy again, appellate jurisdiction is absent.

We are guided in our analysis by two recent decisions of the Supreme Court, *United States v. Wilson, supra,* and *United States v. Jenkins,* 420 U.S. 358, 95 S.Ct. 1006, 43 L.Ed.2d 250 (1975). In *Wilson* the trial court granted the defendant's motion to dismiss the indictment after the jury found him guilty. The Government appealed, and the defendant claimed that the

---

**3.** We emphasize that our ultimate conclusion on the jurisdictional question is unchanged even if we assume that, by dismissing the infor-

mation, the trial court was declining to proceed under the stipulation. In that event, jeopardy would not have attached at all.

**826**

Court lacked jurisdiction because reversal would result in double jeopardy. The Supreme Court held that further jeopardy would not result from a reversal, and thus established its jurisdiction to reach the substantive issues on appeal. The Court noted that the policies of the double jeopardy clause prevent the Government from getting a second chance to present its case to the trier of fact, perhaps using the experience gained during the first proceeding to obtain a conviction. 420 U.S. at 352, 95 S.Ct. 1013. It followed that such policy considerations were not present where determination of the disputed legal issue would not result in a retrial, but would merely reinstate the jury verdict. *Id.* at 353, 95 S.Ct. 1013.

In *Jenkins* the Court considered a somewhat similar issue, presented, however, in the context of a trial to the court without a jury. At the close of the case, the district court filed findings of fact and conclusions of law, and ordered the indictment dismissed and the defendant discharged. The Supreme Court noted that in considering the double jeopardy problem, a bench trial differs from a jury trial in certain respects:

In a case tried to a jury, the distinction between the jury's verdict of guilty and the court's ruling on questions of law is easily perceived. In a bench trial, both functions are combined in the judge, and a general finding of "not guilty" may rest either on the determination of facts in favor of a defendant or on the resolution of a legal question favorably to him. If the court prepares special findings of fact . . . it may be possible upon sifting those findings to determine that the court's finding of "not guilty" is attributable to an erroneous conception of the law whereas the court has resolved against the defendant all of the factual issues necessary to support a finding of guilt under the correct legal standard.

420 U.S. at 366–67, 95 S.Ct. at 1011. The Court pointed out, however, that this could not be done in the case before it:

[It is not] clear to us that the District Court, in its findings of fact and conclusions of law, expressly or even impliedly found against respondent on all the issues necessary to establish guilt under even the Government's formulation of the applicable law. The court's opinion certainly contains no general finding of guilt, and although the specific findings resolved against respondent many of the component elements of the offense, there is no finding on the statutory element of "knowledge."

420 U.S. at 367, 95 S.Ct. at 1012. Distinguishing *Wilson,* the Court in *Jenkins* found that it could not simply "reinstate the general finding of guilt: there was no such finding, in form or substance, to reinstate." *Id.* at 368, 95 S.Ct. at 1012. The Court thus held that the appeal had been properly dismissed.

■ In light of the foregoing discussion, we find that the question in the instant case should be stated as follows: Once jeopardy has attached, and the proceedings are resolved in favor of the defendant, and the Government then appeals, will any proceedings after appeal require a determination of further factual issues before convicting or acquitting the defendant? If the answer is affirmative, because at the first trial sufficient facts were not established to satisfy all essential legal elements for a conviction, then the appeal is barred by the double jeopardy clause. While there may be some exceptions to this proposition, we discern none in the case before us.

In our case, unlike in *Jenkins,* it is relatively easy to separate the district judge's resolution of fact from his determination of law. Since the case was submitted on a written stipulation of facts, the district court was not required to hold further proceedings before entry of judgment.[4]

4. The existence of an express written stipulation distinguishes this case from *United States v. Patrick,* 532 F.2d 142 (9th Cir. 1976). In that case, we found that a reversal of a judgment of acquittal would place the defendant twice in jeopardy. We noted that although there were no disputed factual issues, the defendant below had not entered into an express stipulation of facts. 532 F.2d at 147. Without such a stipulation, the trial court had no power to find the

Nevertheless, it elected to dismiss the information solely on a point of law. In this respect the case much more closely resembles *Wilson* than *Jenkins,* even though *Wilson* involved a jury trial and this case involved a bench trial. Here, as in *Wilson,* it is easy to separate factual resolutions from determinations of law. No additional facts must be found to determine whether the stipulation supports the conviction of the defendant. The only determination to be made is a legal one. Accordingly, we reach the merits of this appeal.

## II

The statute under which appellee was charged prohibits entry without lawful authority or permission for the purpose of hunting, trapping, or fishing "upon any land that belongs to any Indian or Indian tribe, band, or group and either are held by the United States in trust or are subject to a restriction against alienation imposed by the United States, or upon any lands of the United States that are reserved for Indian use . . . ." 18 U.S.C. § 1165. The prosecution contends that Finch made an unauthorized entry on the riverbed by casting his lure in the water. Therefore, to resolve the issue of guilt in this case, we must first determine whether the bed of the Big Horn River within the exterior boundaries of the Crow Reservation is Indian land within the statutory definition.

The present Crow Indian Reservation is part of a large tract recognized as Crow lands by the Treaty of Fort Laramie of 1851, 11 Stat. 749, 2 C. Kappler, Indian

Affairs: Laws and Treaties 594 (hereinafter cited as Kapp.). The Treaty with the Crows of 1868, 15 Stat. 649, 2 Kapp. 1008, carved out from the 1851 territory a reservation of some 8,000,000 acres for the Crow Indians. Subsequent acts further reduced the size of the reservation.[5] The Big Horn River is a navigable watercourse[6] which flows through the heart of the Crow Indian Reservation from south to north.[7] Prior to 1851, the United States owned the bed of the Big Horn River. *Cf. United States v. Southern Pacific Transportation Co.,* 543 F.2d 676, 685 (9th Cir. 1976). The United States either transferred beneficial ownership of the bed to the Crow Tribe by the treaties of 1851 and 1868 or retained ownership of the bed as public lands, which passed to the State of Montana upon its admission to the Union.[8] Our disposition of this case depends on which alternative the Government followed when it signed the treaties. Our examination is controlled by the opinions of the Supreme Court in two cases ruling on title to lands underlying navigable waters situated in Indian territory: *United States v. Holt State Bank,* 270 U.S. 49, 46 S.Ct. 197, 70 L.Ed. 465 (1926) and *Choctaw Nation v. Oklahoma,* 397 U.S. 620, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1969). Correct application of these precedents is a delicate matter, as the two cases seem to fall on either side of the present controversy.

It was early determined, before the *Holt* and *Choctaw* cases arose, that a disposition by the United States of public lands bordering on navigable waters, as a general

---

defendant guilty; if the judgment of acquittal had been reversed, a remand to the district court would have required further proceedings devoted to resolution of essential factual issues. By contrast, appellee in this case did enter into an express stipulation of facts upon which the district court would be required to make a determination of guilt if all of the defendant's legal arguments were resolved against him. The *Patrick* opinion implies that had such a stipulation of fact existed in that case, a remand to the district court would *not* have put defendant in jeopardy a second time. The case therefore supports our conclusion that a remand in this case will not place appellee twice in jeopardy.

5. 22 Stat. 42 (1882); 26 Stat. 989 (1891); 33 Stat. 352 (1904); 50 Stat. 884 (1937).

6. The parties have stipulated that the Big Horn River is now a navigable waterway.

7. See the maps reproduced following the opinion of the district court. 395 F.Supp. at 215–20.

8. *Choctaw Nation v. Oklahoma,* 397 U.S. 620, 627–28, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1969).

rule, does not convey title or dominion to the lands situated below high water mark. *Shively v. Bowlby*, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331 (1893).[9] In *Shively* the United States had granted land adjacent to the Columbia River to a private party pursuant to the Oregon Donation Act, 9 Stat. 496. The Supreme Court held that absent the clearest expression of intent to the contrary, it would not presume that the United States intended to divest itself of part of the riverbed. The Court stated:

> The United States, while they hold the country as a Territory, having all the powers both of national and of municipal government, may grant, for appropriate purposes, titles or rights in the soil below high water mark of tide waters. But they have never done so by general laws; and, unless in some case of international duty or public exigency, have acted upon the policy, as most in accordance with the interest of the people and with the object for which the Territories were acquired, of leaving the administration and disposition of the sovereign rights in navigable waters, and in the soil under them, to the control of the States, respectively, when organized and admitted into the Union.

152 U.S. at 58, 14 S.Ct. at 569. This principle of construction, applied in *Shively* to a grant to an individual owner, was subsequently invoked by the Supreme Court in a case concerning a transfer of land to Indian tribes, *United States v. Holt State Bank, supra.*

In *Holt State Bank* the dispute concerned ownership of the bed of Mud Lake, which lay wholly within the exterior boundaries of the Red Lake Reservation in the State of Minnesota. The Government, by treaties enacted before Minnesota was admitted to the Union, had recognized the right of the Chippewa Indians to occupy the reservation. The last relevant treaties preceding Minnesota statehood were concluded September 30, 1854, 10 Stat. 1109, 2 Kapp. 648,

and February 22, 1855, 10 Stat. 1165, 2 Kapp. 685. At the time the treaties were signed, Mud Lake was a navigable body of water.

The Court found nothing in the language of the treaties or the background of the treaty negotiations to show an expressed intent by the United States to dispose of the lands underlying Mud Lake. Both the treaty of 1854 and the treaty of 1855 provided for the cession by the Chippewas to the United States of their claimed aboriginal right to occupy certain lands.[10] In return for that cession, the Government recognized that the Chippewas had rights in the land comprising the Red Lake Reservation. By the treaty of 1854, the United States did state that certain tracts of land were to be "set apart and with[held] from sale, for the use of the Chippewas," Art. 2, 2 Kapp. 648; and the treaty of 1855 provided that a sufficient quantity of land "be reserved and set apart . . . for the permanent homes of the said Indians" within designated locations. Art. 2, 2 Kapp. 685, 686. However, no express provisions guaranteeing to the Indians exclusive possession of the tracts were set out in either treaty, nor were any assurances given by the United States that the lands would never be put to any other use. The Supreme Court characterized the effect of the treaties as follows:

> There was no formal setting apart of what was not ceded, nor any affirmative declaration of the rights of the Indians therein . . . .. The effect of what was done was to reserve in a general way for the continued occupation of the Indians what remained of their aboriginal territory . . . ..

270 U.S. at 58, 46 S.Ct. at 200. Following the rule announced in the *Shively* case, the Court held that title and dominion of the lake bed remained vested in the national government and that ownership of the bed

---

9. Our discussion assumes that the Big Horn River was navigable in 1851 and 1868. Our treaty interpretation would follow *a fortiori* if the river was not navigable when the treaties of 1851 and 1868 were signed.

10. Treaty with the Chippewa, 1854, Art. 1, 2 Kapp. 648; Treaty with the Chippewa, 1855, Art. 1, 2 Kapp. 685.

passed to the State of Minnesota on its admission to the Union.

In *Choctaw Nation v. Oklahoma, supra,* the second principal authority to be considered on this question, the Supreme Court, after examining treaty grants made under different circumstances, reached a different conclusion as to the ownership of lands underlying navigable waters. The Court was presented with the issue whether treaty grants from the United States to the Cherokee and Choctaw Indians conveyed title to parts of the Arkansas River. A series of treaties had provided for the relocation of the Choctaw and Cherokee tribes, but so great was the force of our westward expansion that part of the lands set aside for these Indians had already been settled before the Indians could be relocated. Attempts at further voluntary removal failed, and the national government, as well as the states of Georgia and Mississippi, started to exert pressure on the Indians. The Supreme Court described what followed:

> Thus faced with the prospect of losing both their lands and way of life, the Choctaws agreed in 1830 to leave Mississippi and to move to new lands west of the Arkansas territory. As a guarantee that they would not again be forced to move, the United States promised to convey the land to the Choctaw Nation in fee simple "to inure to them while they shall exist as a nation and live on it."

397 U.S. at 625, 90 S.Ct. at 1331. Similar promises were made to the Cherokees. *Id.* at 626, 90 S.Ct. 1328. The Court concluded that this background, together with the rule of construction that well-founded doubts should be resolved in favor of the Indian tribes, were sufficient to overcome the presumption that the United States retained ownership of the riverbed. Accordingly, it found the *Holt State Bank* case inapplicable and held that the bed of the Arkansas River, at the disputed locations, was owned by the Indian tribes.

Turning to the case before us, we first examine the negotiations and background of the two relevant treaties with the Crows. These are the Treaty of Fort Laramie of 1851, *supra,* and the Treaty with the Crows of 1868, *supra.* The history and negotiation of the treaties were considered in detail by the Court of Claims in *Crow Tribe of Indians v. United States,* 284 F.2d 361, 151 Ct.Cl. 281 (1960); *Crow Nation v. United States,* 81 Ct.Cl. 238 (1935); and *Fort Berthold Indians v. United States,* 71 Ct.Cl. 308 (1930). In brief, the negotiations for the Treaty of Fort Laramie of 1851 were precipitated by the increasing number of settlers who were crossing Indian lands on the westward journey to California, commencing in 1849 and 1850. The travelers freely used Indians lands for hunting buffalo and other game, and consumed timber and forage in increasing quantities. The Indians resented, and in some cases violently resisted, these incursions. Internecine warfare between different tribes over unsettled and ill-defined boundaries compounded the danger. The United States began negotiations with the Indians to stop these hostilities.

The Treaty of Fort Laramie of 1851 was concluded between the United States and eight Indian nations, including the Crows. On their face, the terms of the Treaty of Fort Laramie of 1851 do not constitute a clear and unambiguous grant of lands from the federal government to the Indian tribes. Article 5 of the treaty is cast as a covenant among the tribes alone to recognize specified boundaries for their respective territories, and from this clause, the United States would not appear to be a party to the recognition of Indian boundaries. 2 Kapp. 594.

Other provisions of the treaty lend support to a contrary reading. For example, in Article 3 the United States undertook to protect the Indians "against the commission of depredations by the people of the said United States," after the ratification of the treaty. *Id.* By Article 2, the Indians conceded to the United States the right "to establish roads, military and other posts, within their respective territories." *Id.* The treaty also provides for monetary compensation for the concessions by the tribes, as well as for damage to the Indian nations both past and future. Art. 7, *id.* at 595.

By negative inference, these terms are susceptible to the interpretation that the Government of the United States recognized the Indian lands as belonging to the tribes. But they fall far short of constituting an express grant of all lands, including the beds of navigable streams, contained within the territorial boundaries.

Of more help to the appellant's position are the assurances that were given to the Indians by the Government during the negotiations preceding the 1851 treaty. The territories at issue were referred to as "your country" and "your land" and "your territory." [11] Similar references are contained in internal governmental communications.[12] It is principally in light of this background that the Court of Claims reached the conclusion that the United States, by the Treaty of Fort Laramie of 1851, recognized the title of the Crow Tribe to the lands described as theirs in Article 5 of the treaty. *Crow Tribe of Indians v. United States, supra,* at 371.

■■ We need not, however, resolve this case solely by reference to the Treaty of Fort Laramie of 1851. *Choctaw Nation, supra,* directs us to interpret the terms of an Indian treaty in light of its history and the negotiations preceding it and to construe doubtful language in favor of the Indians. The second relevant treaty, the Treaty with the Crows of 1868, when interpreted in light of its negotiations and the earlier treaty, convinces us that the national government, in 1868, did cede exclusive rights to the reservation lands. This cession, moreover, included rights in the riverbed.

Some fifteen years after the treaty of 1851, the Crow Tribe was approached anew by the Government. The purpose of the Government in the ensuing negotiations with the Crows was similar to that in its earlier negotiations with the Choctaw and Cherokee tribes: to reduce the size of the territory earlier designated as belonging to the tribe. During the negotiation of this second treaty, the Government, now acting through the Commissioner of Indian Affairs, again used language indicating that the Crows were to own the territory covered by the treaty.[13] Furthermore, the terms

---

11. *See Crow Tribe of Indians v. United States,* 284 F.2d 361, 366–67, 151 Ct.Cl. 281 (1960), *quoting* from an address by Treaty Commissioner Mitchell at the initial Council with the assembled representatives of the eight Indian Nations, held on September 8, 1851, reported in the St. Louis Republican, Oct. 26, 1851.

12. *See* letter from Commissioner of Indian Affairs, W. Medill, to the Secretary of the Interior, June 15, 1849, *quoted in Crow Tribe of Indians v. United States,* 284 F.2d 361, 365, 151 Ct.Cl. 281 (1960); 1849 Report to Secretary of the Interior from Commissioner of Indian Affairs, *quoted in Crow Tribe of Indians, supra,* at 366; *Cf.* Letter from Commission of Indian Affairs to Treaty Commissioner Mitchell, May 26, 1851, S.Doc. No. 53, 70th Cong., 1st Sess. (1851), 4 Kapp. 1074–75, *quoted in Crow Tribe of Indians, supra,* at 366.

13. *Crow Tribe of Indians v. United States,* 284 F.2d 361, 367 n.3. The briefs filed by the United States and the *Crow Tribe in Crow Nation v. United States,* 81 Ct.Cl. 238 (1935), quote from the address of Commissioner Taylor to the representatives of the Crow Tribe at the beginning of the negotiations of the Treaty of 1868 at Fort Laramie on November 12, 1867, set out in the record of that case. 671 Printed Records of the Court of Claims 921–22, 1343. Commissioner Taylor said to the Crows, in part:

My friends, chiefs, headmen, and warriors of the Crow Nation: * * * At our invitation you have come a long way, through much difficulty, to meet us. * * * Your Great Father at Washington, though so far away from you, is well informed of your friendship toward us. * * * He knows also, of some of the troubles and difficulties that surround you. He has sent us to see you in order that he may learn more fully, from your own lips, your true situation, and that he may take all necessary steps to remove those difficulties and to make your way smooth for the future. We learn that valuable mines have been discovered in your country, which, in some instances, are taken possession of by the white people. We learn that roads are laid out and traveled through your lands; that settlements have been made upon your lands; that your game is being driven away and is fast disappearing. We know, also, that the white people are rapidly increasing and are taking possession of and occupying all the valuable lands.

Under these circumstances we are sent by the Great Father and the great council at Washington to arrange some plan to relieve you, as far as possible, from the bad conse-

of the 1868 treaty themselves evidence an intent on the part of the United States to recognize that the Crow Indians were to have beneficial ownership of all lands within the exterior boundaries of the reservation. The national government explicitly agreed that such lands would be "set apart for the absolute and undisturbed use and occupation of the Indians herein named, and for such other friendly tribes or individual Indians as from time to time they may be willing, with the consent of the United States, to admit amongst them . . . ." Art. 2, 15 Stat. 649, 2 Kapp. 1008. The treaty continues:

> [T]he United States now solemnly agrees that no person, except those herein designated and authorized so to do, and except such officers, agents, and employés of the Government as may be authorized to enter upon Indian reservations in discharge of duties enjoined by law, shall ever be permitted to pass over, settle upon, or reside in the territory described in this article for the use of said Indians . . . .

*Id.*[14]

Both the assurances given to the Indians during the negotiation of the treaty of 1868, considered against the background of the treaty of 1851, and the explicit language of the 1868 treaty could have had no other meaning in the minds of the Indians than that the Government recognized that all the lands within the metes and bounds

of the reservation were to be theirs. We thus conclude that the United States, by signing the treaty of 1868 with the Crows, intended to grant them dominion and control over that portion of the bed of the Big Horn River situated within the reservation,[15] subject to the retained power of the United States to exercise its paramount right to control navigation on the river.

It is true that the Treaty with the Crows of 1868 does not contemplate, by its express terms, that a patent will issue to convey the land to the Indian nation, nor does it contain an explicit promise that no part of the land granted shall be embraced in any territory or state, as did the treaties with the Choctaws and the Cherokees considered in *Choctaw Nation.* But the absence of similar provisions in the treaty with the Crows is not determinative. We rule, in light of the foregoing, that in establishing the Crow Reservation, the United States intended that all lands therein, including the riverbed, were to be for the exclusive use of the tribe.

Appellee has referred us to authorities in this circuit which, when deciding in doubtful cases whether the United States intended to convey lands underlying navigable waters to Indian tribes, inquire whether the livelihood of the Indians centered around fishing.[16] He argues that since there is no evidence that the Crow Indians used the river as a source of food, the Government

quences of this state of things and to protect you from future difficulties. We desire to set apart a tract of your country as a home for yourselves and children forever, upon which your Great Father will not permit the white man to trespass. We wish you to mark out a section of country that will suit you for this purpose. When that is set apart, we desire to buy of you the right to use and settle the rest, leaving to you, however, the right to hunt upon it all as long as the game lasts. *Id.* at 921–22.

14. By Article 11 of the treaty, the United States undertook that "[n]o treaty for the cession of any portion of the reservation [therein] described, which may be held in common [would] be of any force or validity as against the said Indians unless executed and signed by, at least, a majority of all the adult male Indians occupy-

ing or interest in the same . . . ." 2 Kapp. at 1011. Such language also assumes that the United States recognized the extensive ownership rights of the Crow Tribe in the reservation lands.

15. In *Montana Power Co. v. Rochester,* 127 F.2d 189 (9th Cir. 1942), this court reached a similar result in construing the Treaty of July 16, 1855, 12 Stat. 975, 2 Kapp. 722, negotiated with the Confederated Tribes of the Flathead, Kootenai, and Upper Pend d'Oreilles Indians.

16. *E. g., Skokomish Indian Tribe v. France,* 320 F.2d 205 (9th Cir. 1963); *Moore v. United States,* 157 F.2d 760 (9th Cir. 1946). *See also Alaska Pacific Fisheries v. United States,* 248 U.S. 78, 39 S.Ct. 40, 63 L.Ed. 138 (1918).

could not have intended to grant the riverbed to the Crow Tribe. Appellee misapprehends the purpose of Congress in creating the Crow Reservation. By establishing a reservation as a "permanent home" for the Crow Indians, see Treaty with the Crows of 1868, Art. 4, 2 Kapp. 1008, 1009, the Government manifestly intended to set aside lands which would provide the tribe with the food and natural resources upon which their livelihood depended. It is true that the Crow Indians, in 1868, were predominantly hunters.[17] The aim of the United States, however, was to fix the Crows in one location and to reorient their way of life toward "agricultural and other pursuits." [18] We find it inconceivable that the United States intended to withhold from the Indians the right to sustain themselves from any source of food which might be available on their reservation. It must have been no mystery to the Government that the Crow Tribe, whose nomadic ways they sought to change, might eventually be forced to derive their existence from a source other than big game, should the large herds of buffalo and elk roaming the plains become extinct by accident of nature or decimation by man. *Cf. Menominee Tribe of Indians v. United States,* 388 F.2d 998, 179 Ct.Cl. 496, 1002 (1967), *aff'd,* 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968). We therefore decline to adopt an interpretation which would mean that the treaty of 1868 deprived the Crow Indians of

potential control over a source of food on their reservation.[19]

Appellee argues that regardless of our determination as to ownership of the riverbed, he had a right to fish from the bank. Casting a fishing line and lure from a riverbank is an intrusion wholly sufficient to constitute an entry upon the riverbed. *See* W. Prosser, Handbook of the Law of Torts § 13 at 69 (4th ed. 1971). Appellee contends, however, that as the state's licensee he was exercising a privileged riparian right of access to the river, incident to Montana's ownership of the bank, and that he was not guilty of a "trespass on Indian lands" when he entered upon the riverbed to fish. We disagree.

 Before explaining the principles of riparian ownership that are controlling in this case, we note that our determination of these questions is announced as a matter of federal law. This results from the circumstances of the original grant of the riparian lands here in question. The State of Montana is, by purchase, the successor in interest of an original patentee whose grant was in fee simple from the United States. The riverbank in question originally constituted part of lands held by the United States in trust for the Crow Tribe, and it was deeded by the United States to the state's earliest predecessor in title, pursuant to the General Allotment Act of 1887, 24 Stat. 338, 25 U.S.C. §§ 331 *et seq.* When the national government holds trust owner-

---

17. Published histories of the Crow Tribe indicate that the Crow Indians engaged principally in the hunting of large game such as elk and buffalo. Fishing was neither a primary nor an important source of food or industry. In his definitive study of the Crow Tribe, R. Lowie states:

> A Crow was not happy without a diet of the flesh of ruminants. Boys went out shooting rabbits for fun, but that would be starvation fare for adults. I have never met a reference to eating of fish; berries, and roots dug up by the women formed a regular part of the ancient bill of fare but only as seasoning or dessert; and the corn traded in from the Hidatsa was eaten for the sake of variety rather than as a substitute for meat.

R. Lowie, The Crow Indians 72 (1938).

18. *See* Letter from C. E. Mix, Acting Commissioner of Indian Affairs, to W. J. Cullen, Special Agent for Montana, April 30, 1868, informing Cullen of his appointment by the President as a Treaty Commissioner and instructing him of his duties, *quoted in part, Crow Nation v. United States,* 81 Ct.Cl. 238, 250 (1935).

19. It should further be noted that the cases cited in note 15, *supra,* where an examination of the lifestyles of the Indian tribes was considered particularly important, involved controversies over the location of the exterior boundaries of lands set aside for the Indians. In the case before us, it is clear that the part of the Big Horn River at issue is within the metes and bounds of the Crow Reservation. *Cf. Choctaw Nation v. Oklahoma,* 397 U.S. 620, 628, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1969).

ship of a navigable stream bed and the lands littoral to it, and thereafter conveys the banks of the stream, the nature and extent of riparian rights conveyed by deeds to such lands must be determined as a matter of federal law. *The Confederated Salish and Kootenai Tribes v. Namen*, 534 F.2d 1376 (9th Cir. 1976), *aff'g* 380 F.Supp. 452 (D.Mont.1974).

In the *Namen* case this Court concluded that Congress must have intended that grants of riparian lands under the Indian Allotment Acts should carry riparian rights of access and wharfage. 534 F.2d at 1377. It is therefore clear that the State of Montana and its licensees have a right of access to the waters of the Big Horn River at the location in question. It does not follow, however, that Montana's right of access to the waters of the river includes a protected right to enter upon the riverbed for the purpose of fishing. *Cf. United States v. Pollmann*, 364 F.Supp. 995, 1000 (D.Mont. 1973). In order to prevail, appellee therefore must demonstrate the existence of an independent riparian right to fish inuring to the State of Montana by virtue of its riparian ownership, and that such right is paramount to the regulatory authority exercised by the national government and the Indian tribe.

■ We find little guidance in the decided cases for resolving questions concern-ing the source or extent of a riparian right to fish in navigable waters as a matter of federal common law. The authorities that have come to our attention involve the interpretation of state or territorial law, and they are generally inconclusive on the subject. A majority of the cases contain oblique references to a riparian right to fish in navigable waters but give no indication of the limitations on its exercise.[20] Those few cases which discuss the dimensions of the riparian right to fish express two different views. The first group states that the right of a riparian owner to fish in navigable waters is no greater than the common right of fishing enjoyed by the general public,[21] and from this it would follow that the riparian right to take fish is simply a right of access, from which one cannot derive an additional interest in land, a *profit à prendre* for fishery. The second view appears to recognize a riparian right to fish which is superior to the common right of fishery.[22]

■ Despite these differences, however, the cases which address the point indicate that the riparian right to fish, whether it is a *profit à prendre* or simply the means of access to a right that is enjoyed by all, is in either event subject to close regulation by the governing authorities;[23] and we need go no further than to recognize this principle to resolve the instant case. We hold

**20.** *See, e. g., United States v. Sexton Cove Estates*, 526 F.2d 1293, 1300 n.18 (5th Cir. 1976); *Springer v. Joseph Schlitz Brewing Co.*, 510 F.2d 468, 470 (4th Cir. 1975); *Burns v. Forbes*, 412 F.2d 995, 998 (3rd Cir. 1969); *United States v. 220.0 Acres of Land, State of Md.*, 306 F.Supp. 138, 151 (D.Md.1969). *See also* G. Thompson, Real Property § 274 (2d ed. 1964).

The only facet of the right which seems well established is that a riparian owner has no exclusive right to fish in navigable waters in the absence of an express grant and, as a corollary, may not prevent the public from fishing in the navigable waters contiguous to his land. *See, e. g.*, 2 American Law of Property § 9.49 (A. J. Casner ed. 1952); H. Farnham, Water and Water Rights ¶ 375 (1904); Waters and Water Rights § 36.4(A) at 198 (R. Clark ed. 1967); S. Wiel, Water Rights in the Western States § 907 (3d ed. 1911); Annot., 47 A.L.R.2d 381; 35 Am.Jur.2d *Fish and Game* § 11; 36A C.J.S. Fish §§ 6, 8.

**21.** *International Shoe Co. v. Heatwole*, 126 W.Va. 888, 30 S.E.2d 537, 540, (1944); *Small v. Wallace*, 124 Me. 365, 129 A. 444, 445 (1925).

**22.** *Ross v. Mayor and Council of Borough of Edgewater*, 115 N.J.Law 477, 180 A. 866, 870 *aff'd*, 116 N.J.Law 447, 184 A. 810, *cert. denied*, 299 U.S. 543, 57 S.Ct. 37, 81 L.Ed. 400 (1935).

**23.** *C. J. Hendry Co. v. Moore*, 318 U.S. 133, 135, 63 S.Ct. 499, 87 L.Ed. 663 (1943) and cases cited therein; *United States v. Pollmann*, 364 F.Supp. 995, 1000 (D.Mont.1973); *Corsa v. Tawes*, 149 F.Supp. 771, 773 (D.Md.), *aff'd per curiam*, 355 U.S. 37, 78 S.Ct. 116, 2 L.Ed.2d 70 (1957). *See* H. Farnham, Water and Water Rights ¶¶ 375, 382 (1904); S. Wiel, Water Rights in the Western States § 907 (3rd ed. 1911); 36A C.J.S. *Fish* §§ 8, 26.

that the Government has exercised regulatory power which is superior; on the facts of this case, to any riparian right to fish held by the State of Montana or its licensees.

Appellee would deny that the United States, either alone or in conjunction with the Crow Tribe, is exercising a regulatory power in this case, and contends that the Crow Tribe Ordinance which closed Indian lands to fishing was promulgated without authority. We reject that argument.

▆▆▆▆ Even assuming that the authority of the Crow Tribe to control access to its own reservation is insufficient to sustain the closure of its lands to fishing by non-Indians, *but cf. Quechan Tribe of Indians v. Rowe,* 531 F.2d 408 (9th Cir. 1976), the authority to withhold permission to enter for fishing, hunting, or trapping has been expressly conferred on the tribe by the promulgation of 18 U.S.C. § 1165, an enactment clearly within the national power.

The language and the history of 18 U.S.C. § 1165 show that the right of Indians to control hunting, trapping and fishing on their lands is a prerogative of ownership which the United States recognizes as a matter of federal law. It was the intent of Congress that "Indian property owners should have the same protection as any other property owners" such as, for example, "a private hunting club [which] may keep nonmembers off its game lands or . . . may issue a license for a fee." [24] Under the Act, a tribe may refuse entry for fishing on its lands just as an individual Indian owner might do, and the sanctions apply in either case. The Crow Tribal Ordinance dated October 13, 1973, by which nonmembers of the tribe were prohibited from fishing within the confines of the reservation, was ample notification by the beneficial owners of the bed of the river within the reservation that consent to entry for such purposes was withheld.[25]

24. H.Rep. No. 625, 86th Cong., 2d Sess. 2; S.Rep. No. 1686, 86th Cong., 2d Sess. 2. Prior to the enactment of section 1165, Indian property owners could not protect their lands against trespassing by non-Indians for the purpose of hunting, trapping, and fishing. Both the House and the Senate reports stated that "[n]on-Indians are not subject to the jurisdiction of Indian courts and cannot be tried in Indian courts on trespass charges." H.Rep. No. 625, *supra,* at 2; S.Rep. No. 1686, *supra,* at 2. (The correctness of that assumption may now be questioned in light of our recent decision in *Oliphant v. Schlie,* 544 F.2d 1007 (9th Cir. 1976).) Furthermore, there were no federal laws which could be invoked against trespassers. The House report notes:

There is a Federal statute making it an offense for a non-Indian to hunt or trap on lands of treaty tribes except for subsistence (25 U.S.C. 216). However, as pointed out in the report of the Secretary of the Interior, this act does not cover fishing, is limited to lands of tribes with treaties, and in effect sanctions trespass if it is "for subsistence in Indian country." To this might be added the practical fact that some U.S. attorneys hesitate to prosecute under this act which dates back to 1834, because of the difficulty of proof on the subsistence point and mainly because there is a feeling that the 1834 act was designed for the old-time professional hunter and trapper, not the weekenders or local rod-and-gun members who pose the modern problem.

H.Rep. No. 625, *supra,* at 2. The legislation was thus intended to provide sanctions for hunting, trapping, and fishing on Indian lands "without the consent in the form of a license or permit for which a fee can be charged, by the Indian or tribe concerned." H.Rep. No. 625, *supra,* at 1. *See also* Letter from Assistant Secretary of the Interior Ernst, to Rep. Celler, Chairman of the Committee on the Judiciary, February 13, 1958, which states in pertinent part:

In a great many instances, fish and game are much more plentiful on Indian reservations than on adjacent lands, and non-Indian hunters and fishermen come onto the reservations to hunt and fish. Indian tribes have the right to control or to prohibit hunting and fishing on their reservations, and to charge fees for permitting hunting and fishing. Sometimes the money derived from hunting and fishing permits represents a sizable portion of the tribal income.

H.Rep. No. 625, *supra,* at 4.

25. That the waters of the Big Horn River are navigable is irrelevant to the question whether or not there was a prohibited entry for the purposes of fishing. We have expressly observed that there is no inherent conflict between the Government holding lands in trust exclusively for Indian fisheries and its also holding the waters over such lands in trust for the purposes of navigation. *Moore v. United States,* 157 F.2d 760 (9th Cir. 1946). It is well settled that the United States may exercise its power to protect Indian fisheries even as to

Appellee finally contends that the ordinance which bans all nontribal members from fishing on the Crow Reservation denies him equal protection of the laws guaranteed to nontribal members by 25 U.S.C. § 1302(8), and is therefore void. The Supreme Court rejected similar arguments in *Morton v. Mancari,* 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974). *See also Moe v. The Confederated Salish and Kootenai Tribes of the Flathead Reservation,* 425 U.S. 463, 480, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976). Its explanation for sustaining the statute specially applicable to the Indians in that case is equally applicable to the tribal ordinance at issue here.

We conclude that the bed of the Big Horn River within the confines of the Crow Indian Reservation is held by the United States in trust for the Indian tribe and that appellee violated 18 U.S.C. § 1165 by willfully and knowingly fishing without lawful authority or permission of the tribe.

The order of the district court dismissing the information is accordingly reversed, and the cause is remanded for entry of judgment based on the stipulation filed in the district court by both parties to this cause.

REVERSED AND REMANDED.

waters that are subject to the public easement of navigation. *Alaska Pacific Fisheries v. United States,* 248 U.S. 78, 39 S.Ct. 40, 63 L.Ed. 138 (1918).